The **TIMKEN COMPANY**, Plaintiff,

v.

**UNITED STATES**, Defendant,

China National Machinery & Equipment Import and Export Corporation (CMEC), Defendant–Intervenor.

Court No. 87–06–00738.

United States Court of International Trade.

Oct. 18, 1988.

Stewart and Stewart (Eugene L. Stewart and Terence P. Stewart), Washington, D.C., for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Civil Div., Commercial Litigation Branch, U.S. Dept. of Justice (Platte B. Moring, III), Washington, D.C., for defendant.

Graham & James (Lawrence R. Walders and Brian E. McGill), Washington, D.C., for defendant-intervenor.

## OPINION AND ORDER

TSOUCALAS, Judge:

Plaintiff, a domestic manufacturer of tapered roller bearings (TRBs), challenges the final affirmative determination of the United States Department of Commerce,

International Trade Administration (Commerce) in *Tapered Roller Bearings from the People's Republic of China; Final Determination of Sales at Less Than Fair Value,* 52 Fed.Reg. 19,748 (May 27, 1987), which resulted in an exclusion of a foreign exporter's TRBs from the scope of the antidumping finding. Plaintiff disputes this determination on several grounds: (1) Commerce improperly applied the constructed value over the price methodology and the "best information available rule"; (2) Commerce erroneously appraised several components of production costs from India, the comparable surrogate country, which led to significant understatement of foreign market value; and (3) Commerce violated procedural due process by using data on which plaintiff did not have an opportunity to comment. The matter is before the Court on plaintiff's motion for judgment on the administrative record.[1]

### Background

Commerce instituted an antidumping investigation which targeted two TRB exporters from the People's Republic of China (PRC): Premier Bearing & Equipment, Limited, and CMEC. Since the PRC is a state-controlled, non-market economy country, 19 U.S.C. § 1677b(c) (1982) requires Commerce to designate a nonstate-controlled surrogate country in which the foreign market value of Chinese TRBs will be determined. In accordance with 19 C.F.R. § 353.8(b), Commerce initially considered Egypt, India, Indonesia, Morocco, Pakistan, Thailand, and the Philippines as possible comparable economic conduits. Of these, only India and Indonesia were found to manufacture TRBs. Administrative Record Document No. 21 [hereinafter A.R. Doc. ____]. Finding Indonesia unsuitable as a comparable economy, Commerce designated India as the comparable surrogate country to the PRC.[2]

1. On June 24, 1987, this Court denied plaintiff's application for a preliminary injunction to restrain liquidation of entries exported by the excluded foreign manufacturer, China National Machinery & Equipment Import & Export Corporation (CMEC). *See Timken Co. v. United States,* 11 CIT ——, 666 F.Supp. 1558 (1987).

CMEC is the defendant-intervenor in the present action.

2. Commerce eliminated Indonesia as a possible comparable surrogate since the only bearing manufacturer in Indonesia "carried on a great deal of business with Eastern Bloc countries and additionally had not proved to be coopera-

Commerce then dispatched surrogate questionnaires to six Indian TRB producers. Only one company, which was negotiating a joint venture with plaintiff, responded. Commerce rejected that company's price information upon being informed that the Indian government would not verify the report. Commerce reasoned that in the absence of verification, the figures lacked the requisite indicia of reliability.

Plaintiff offered cost data from Argentina, Mexico, and Spain, urging Commerce to utilize the price methodology. Commerce rejected these submissions on the grounds that the countries have advanced economies which preclude corresponding comparison with the PRC. The production statistics plaintiff's Brazilian subsidiary voluntarily supplied were likewise rejected on the incommensurability of economies rationale and also because they were untimely.

Pursuant to 19 C.F.R. § 353.8(b)(1), Commerce adopted the constructed value methodology which calls for a calculation of the foreign market value of TRBs on the basis of assigning the designated surrogate country's costs to Chinese factors of production. In constructing value, Commerce utilized cost information acquired from both the Indian Steel Authority's publication *Statistics for Iron and Steel Industry in India* and the U.S. Consulate in Bombay, India. To ascertain the Chinese factors of production, Commerce verified the PRC's manufacturing process through on-site inspections. A.R.Doc. 113. The Consulate's data, which Commerce relied on as the "best information otherwise available," were unverifiable due to the Indian government's lack of participation. On May 27, 1987, Commerce made a final affirmative determination that tapered roller bearings from the PRC were being sold in the United States at less than fair value, but found no dumping margin for CMEC. 52 Fed.Reg. 19,748.

Plaintiff claims that the statutory and the regulatory foreign market value provisions involved advance prices over constructed value, compelling Commerce to first use the price information from India,

Brazil, Argentina, Mexico, and Spain. Plaintiff further contends that statutory verification provision 19 U.S.C. § 1677e (1982 & Supp. IV 1986), requires an exhaustion of verifiable data in the petition before utilizing the designated comparable surrogate's unverified figures as the "best information otherwise available."

Plaintiff also alleges that substantial evidence in the record does not support Commerce's calculation of the net raw material cost and the factory overhead. Lastly, it is plaintiff's position that it was denied due process because it was not provided with an opportunity to comment on one telex Commerce received from the U.S. Consulate eight days before publication of the final determination.

## Discussion

### A. *Foreign Market Value*

■ The governing statutory provision for determining foreign market value states in pertinent part:

(c) State-controlled economies

[T]he administering authority shall determine the foreign market value of the merchandise on the basis of the normal costs, expenses, and profits as reflected by *either* —

(1) *the prices* ... at which such or similar merchandise of a non-State-controlled-economy country or countries is sold ...

(A) for consumption in the home market of that country or countries, or

(B) to other countries, including the United States; or

(2) *the constructed value* of such or similar merchandise in a non-State-controlled-economy country or countries ...

19 U.S.C. § 1677b(c) (emphasis added). It is obvious from the use of the disjunctive that Commerce has the discretion to use *either* prices *or* constructed value when computing foreign market value for state-controlled economies. Plaintiff's claim that Commerce is statutorily mandated to employ prices from India, Brazil, Argentina,

---

tive in other business dealings with the [U.S.] [E]mbassy [in Jakarta]." A.R.Doc. 37.

Mexico, and Spain is patently contrary to the clear language of the statute. "[F]ailure to use a discretionary alternative method does not constitute error when the agency uses a lawful second method." *Carlisle Tire & Rubber Co. v. United States*, 9 CIT 520, 525, 622 F.Supp. 1071, 1076 (1985) (citing *Zenith Radio Corp. v. United States*, 9 CIT 110, 113, 606 F.Supp. 695, 698 (1985), *aff'd*, 783 F.2d 184 (Fed.Cir. 1986)). The Court therefore finds Commerce acted in accordance with the statute in adopting the constructed value methodology based on the Indian data.

█ Plaintiff argues that Commerce was otherwise required by its own regulations to utilize prices over the constructed value, citing subsection (a) of 19 C.F.R. § 353.8:

(a) *In general* ... foreign market value shall be determined on the basis of the normal costs, expenses, and profits as reflected *in order of preference by either:*

(1) *The prices* ...; or .

(2) *The constructed value* of such or similar merchandise in a non-state-controlled-economy country, ... (emphasis added).

While section 353.8(a) states an order of preference for prices, it is nevertheless subordinate to the hierarchical order contained in subsection (b) on the comparability of economies:

(b) *Comparability of economies.* (1) *The prices* as determined under paragraph (a)(1), *or the constructed value* as determined under paragraph (a)(2), *shall be determined,* to the extent possible, *from* the prices or costs in a non-state-controlled-economy *country or countries at a stage of economic development comparable to the state-controlled-economy country* ...

(2) *If no non-state-controlled economy country of comparable economic development can be identified,* then the *prices or constructed value* as deter-

mined from another non-state-controlled-economy country or countries other than the United States shall be used ... (emphasis added).

Subsection (b)(1) provides that the "prices ... or the contructed value ... shall be determined" from a comparable non-state-controlled economy. Subsection (b)(2) likewise directs Commerce to utilize "prices or constructed value" from a non-comparable economy "[i]f no non-state-controlled economy country of comparable economic development can be identified." The incorporation by reference of section 353.-8(a) into subsections (b)(1) and (b)(2) clearly establishes the resolution of comparability of economies as a condition precedent to adopting either price or constructed value methodology pursuant to section 353.8(a). Any other interpretation, such as plaintiff insists, not only subverts the order of preference for comparable economies expressly contained in section 353.8(b), but renders superfluous the references to section 353.-8(a) in both subsections (b)(1) and (b)(2). Thus, the "preference" for prices under section 353.8(a) becomes applicable only subsequent to a designation of a comparable surrogate country.[3]

Recognizing this order, *Chemical Products Corp. v. United States*, 10 CIT ——, 645 F.Supp. 289 (1986) (*Chemical Products I*), held that "Commerce may consider the comparability of economies before it determines whether to employ prices or constructed value as a means of determining foreign market value." *Id.* at ——, 645 F.Supp. at 293. Plaintiff in *Chemical Products I*, like the one herein, maintained that where an investigation involves a respondent from a state-controlled-economy country, section 353.8 demands an application of prices from non-comparable economy rather than the constructed value in designated comparable surrogate. In rejecting this argument, the court emphasized that the underlying statutory purpose of arriving at the most accurate foreign

---

**3.** Plaintiff's erroneous contention that the term "preference" mandates Commerce to utilize prices, including ones from non-comparable countries, appears to stem from the regulation's distinct arrangement in which section 353.8(a) sequentially precedes section 353.8(b). Notwithstanding this structure, the regulation, read as a whole, establishes the preeminent position of the comparability formula.

market value necessitates effectuation of the comparability principle. *Id.*

Consistent with the centrality of the comparability formula under the regulation, Commerce is directed to construct value in the designated comparable surrogate even when price data are obtainable from non-comparable countries. As illustrated, section 353.8(b)(2) provides that Commerce "shall" use information obtained from non-comparable countries only when a comparable alternate "can[not] be identified." § 353.8(b)(2). It is uncontroverted that India was properly designated as the PRC's comparable alternate under section 353.-8(b). Moreover, plaintiff neither disputes Commerce's finding that Brazil, Argentina, Spain, and Mexico do not have commensurable economies nor presents any novel claim meriting departure from *Chemical Products I.* While Commerce may avail itself of data from a country other than the designated conduit, adoption of such an inter-surrogate methodology represents a departure from the norm and remains within the scope of Commerce's discretionary power. *Chemical Prods. Corp. v. United States,* 10 CIT ——, 650 F.Supp. 178 (1986) (*Chemical Products II*). Plaintiff's proposition that figures from the above-enumerated non-comparable countries should have been utilized would unlawfully divest Commerce of its authority by inaugurating as a rule, rather than as a means to be employed at Commerce's discretion, the obligatory use of data from an unspecified number of additional countries whenever such information is made available. *Id.*

Plaintiff's alternative claim that the regulation compels Commerce to use the prices plaintiff's Indian business partner provided is based on a misperception of the thrust of "preference" in section 353.8(a). The term does not connote an absolutely binding prescription, but serves as a directive guidance to which Commerce should adhere to the extent that it promotes the fair and effective administration of the complex and intricately interwoven antidumping law. *See Chemical Products I,* 10 CIT at ——, 645 F.Supp. at 292. The application of the regulation is a fluid process tailored, within the bounds of Commerce's reasoned judg-

ment, to the unique set of facts of each investigation. *See China Nat'l Metals & Minerals Import & Export Corp. v. United States,* 11 CIT ——, 674 F.Supp. 1482 (1987). In the present case, the possibility of verifying the figures plaintiff's joint venturer supplied was foreclosed by the Indian government's non-participation. Under these circumstances, Commerce was justified in rejecting data obtained therefrom on grounds of lack of requisite indicia of reliability and adopting the constructed value approach.

## B. *Verification*

The remaining methodological dispute is whether Commerce is precluded from using unverified data from India as the "best information otherwise available" until it has exhausted the verifiable data in the petition. Plaintiff contends that once the Indian government declined participation in the verification effort, Commerce was obliged to use the data from the non-comparable economies of Brazil, Argentina, Mexico, and Spain. In seeking to substantiate its claim, plaintiff advances that the reliability goal underlying the verification provision preempts the comparability of economies determination.

The contested portions of 19 U.S.C. § 1677e provide:

(a) General rule

The administering authority shall verify all information relied upon in making—

(1) a final determination in an investigation,

. . . .

. . . If the administering authority is unable to verify the accuracy of the information submitted, it shall use the *best information available to it* as the basis for its action. . . .

(b) Determination to be made on best information available

[W]henever a party or any other person refuses or is unable to produce information requested *in a timely manner* and *in the form required,* or otherwise significantly impedes an investigation,

use the best information otherwise available. (Emphasis added).

While the imperative "shall" under section 1677e(a) appears to mandate Commerce to verify all data on which it relies, the "best information otherwise available rule" is exempted from its scope. *See also Ansaldo Componenti v. United States*, 10 CIT ——, 628 F.Supp. 198 (1986). In addition, the "best information rule" is broadly enunciated under section 1677e(b). Congress therefore contemplated giving Commerce wide latitude in applying the verification provision to allow it to adapt rapidly to the myriad of circumstances that it faces in the daily administration of the antidumping law. In other words, the verification requirement is admittedly a measure adopted to ensure that Commerce uses reliable data in making its determinations, but its juxtaposition with the "best information rule" attests that the provision is concerned with an equally compelling objective: the expeditious conclusion of investigations.[4]

By advancing the verification goal to the exclusion of the competing obligation on Commerce to make timely determinations, plaintiff improperly seeks to impose an unwarranted intermediary step between Commerce's verification efforts in the designated surrogate and the triggering of the "best information rule." *See Atlantic Sugar*, 744 F.2d at 1561. Directing Commerce to shift the surrogate situs whenever a properly designated economic conduit declines cooperation and verifiable production data become available from other countries would protract investigations, thereby defeating the purpose of the "best information rule."

To the extent the verifiable data in the petition are from non-comparable countries, plaintiff's contention that Commerce was required to utilize them on its theory that the verification concern precedes the determination of the comparability issue contravenes the judicial standard for reviewing an agency's construction of the law. In the absence of clear language to the contrary, Commerce's interpretation will be sustained in accordance with the current congressional expectation of deferring to the special expertise of Commerce in administering the antidumping law. *See Zenith Radio Corp. v. United States*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978) (citations omitted). The "best information available" clause does not link its accessibility with the comparability formula. It was thus fully within Commerce's discretionary power to determine the order of investigatory procedure between verification and the resolution of the comparability question.

While the verification consideration promotes the overall goal of equitable administration of the law, it cannot be said that the comparability principle does not equally contribute to this end. Extensive verification attempts to ensure reliability are meaningless unless they aid in the appraisal of the most precise foreign market value possible.

■ In this connection, the nexus between the nature of information to be verified and the end towards which they are verified is essential "to guarantee that the administering authority makes the fair value comparison on a fair basis—comparing apples with apples." *Smith–Corona Group v. United States*, 713 F.2d 1568, 1578 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1983). It is thus permissible for Commerce to employ unverified data from the designated surrogate as the "best information otherwise available," absent serious defect in the comparable surrogate selection process or *Commerce's* prejudicial error in conducting verification. Plaintiff neither challenges India's status as a comparable surrogate nor argues that Commerce failed to make verification attempts in India. The Court finds therefore that Commerce was justified in adopting the unverified Indian

---

**4.** "[A] major objective of this revision of the antidumping duty law is to reduce the length of an investigation." S.Rep. No. 249, 96th Cong., 1st Sess. 75, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 461. *See also Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed.Cir. 1984).

data as the "best information otherwise available."

In effect, plaintiff's contention regarding the order of proper investigatory procedure is a demand for an exhaustive standard of investigation that was soundly rejected in *Atlantic Sugar.* The court stated that "[w]hile it may be true that the ITC staff might have been more aggressive in pursuing [more detailed data] ... we are not here reviewing the ITC's diligence. *Nothing in the best information rule or its legislative history defines a standard of investigative thoroughness." Id.* at 1561 (emphasis added). The court went on to state that to the extent the administering agency's diligence is relevant, it relates only to the issue of determining the question of the substantiality of the evidence. *Id.* Similarly, *Seattle Marine Fishing Supply Co. v. United States,* 12 CIT ——, 679 F.Supp. 1119 (1988), *appeal docketed,* No. 88–1485 (Fed.Cir. July 1, 1988), pointed out that the issue is not what information becomes the "best information otherwise available," but whether or not substantial evidence exists in the record to support Commerce's findings.

## C. *Substantiality of Evidence*

The next question to be resolved then is whether substantial evidence on the whole record supports Commerce's determination. Substantial evidence is relevant evidence that a "reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed.Cir.1984) (citing *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). The "whole record" means that the Court must consider both sides of the record. It is not sufficient to merely examine the evidence that sustains the agency's conclusion. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

In conformity with the breadth of legislative trust in the administering authority's expertise, however, any judicial review of the agency determination is a limited one. It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record. *Matsushita,* 750 F.2d at 933 (citing *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)).

Plaintiff first alleges that Commerce's reliance on discrete sources of information when appraising the net raw material cost of manufacturing TRBs resulted in a figure that the record on a whole does not support. To calculate the net raw material cost, Commerce needed to subtract from the total cost of steel input the value of scrap steel recovered from the TRB production process. In arriving at the total cost of bearing quality steel bar used in the Chinese TRB production, Commerce used Indian merchant quality steel bar prices listed in the Steel Authority of India's publication *Statistics for Iron and Steel Industry in India,* adjusted to account for quality differences between the bearing and merchant grades of steel. 52 Fed.Reg. at 19,749. When offsetting raw material costs to reflect savings from scrap, Commerce used another source, namely, two telexes from the U.S. Consulate in Bombay, India. A.R.Docs. 98, 130.

Commerce asserts that *Chemical Products II* approved such utilization of information.[5] That case is inapposite for several reasons. Unlike the situation therein, which resulted in an enmeshing of information from two surrogates to avert an "unrealistic" foreign market value estimation, *id.,* the instant case involves two telexes whose inconsistency is laid bare when used in conjunction with the raw material prices listed in the Steel Authority of India's *Statistics for Iron and Steel Industry in India.*

---

**5.** In *Chemical Products II,* the court sustained the use of the Brazilian figures to value the cost of transportation, notwithstanding designation of Thailand as the PRC's comparable surrogate, reasoning that reliance on such data is a proper

alternative if Commerce "finds that a comparison of one element of foreign market value in the surrogate would yield an unrealistic result." *Id.* 10 CIT at ——, 650 F.Supp. at 182.

More specifically, one telex lists prices for various types of steel tubes and rings and states that, "[e]x mill price of steel scrap is rupees 8 to 10 per Kg." A.R.Doc. 98. A subsequent telex repeats the same price-specific scrap value and also provides a more general figure in ratio of raw material cost to scrap worth: "Prices of scrap are generally twenty percent of material cost." A.R.Doc. 130. Commerce's scrap value calculations based on the price-specific scrap information, together with the quoted steel prices in *Statistics for Iron and Steel Industry in India*, yielded a scrap value that is 75.2% of material cost. *Memorandum of Points and Authorities in Support of Plaintiff's Motion for Judgment on the Agency Record* at 16 [hereinafter *Plaintiff's Memorandum*].

Such inconsistent results did not occur in *Chemical Products II.* That court affirmed Commerce's finding on grounds that "the Court must give 'tremendous deference' to the agency administering the antidumping law" and that Commerce adequately explained the reasonableness of its action. *Id.* 650 F.Supp. at 182 (citing *Smith–Corona Group,* 713 F.2d at 1581). In the present action, Commerce provides no contemporaneous rationale for concluding that one cost quotation in the telex is more appropriate than the other. The final calculation worksheets merely state that, "[p]er Bombay ... the scrap price (ex-mill) in India was 8 to 10 rupees per kilogram as of March 10, 1987. As this price was obtained from a bearing manufacturer, it is assumed that the price is for bearing quality steel scrap." A.R.Doc. 132.

The only reference to the inconsistent figures appears in Commerce's brief.[6] Commerce explains, in a conclusory manner without relating to any evidence in the record, that the twenty percent figure "undoubtedly" refers to the ratio for expensive raw materials used by the Indian producers to the low value scrap generated. *Id.* at 23. In a similar fashion, Commerce states

that the higher 75.2% ratio is reasonable since less costly Chinese raw materials yield scrap with high resale value. Both rationales are unsatisfactory. Commerce's assumption that the price-specific figure in the disputed telex refers to bar-generated scrap is invalid. The record indicates that all Indian companies are "using steel tubes and forged rings or roll rings as a substitute for round steel bars." A.R.Doc. 98. Commerce thus failed to provide persuasive justification for its conduct.

■ Invoking the "best information rule" in investigations targeting non-market economies does not discharge Commerce's responsibility of contemporaneously explaining its probative findings. The need for a coherent articulation of its conclusions becomes more urgent in a "best information" context so that the reviewing court may thoroughly consider the circumstances surrounding Commerce's findings. The Court remands this issue so that the mutual inconsistency in the disputed telexes may be resolved by using, to the extent possible, both the raw material prices and the scrap value quoted in the telexes from the U.S. Consulate, adjusted to account for different grades and types of steel input and the kind of scrap the Indian and Chinese TRB companies manufacture.

Plaintiff also raises objections to Commerce's calculation of the factory overhead. Plaintiff insists that insofar as Commerce relied on two telexes obtained from the U.S. Consulate, Commerce had no evidence on which to base its overhead findings. One telex provides the total cost of TRB production, including the overhead, A.R. Doc. 126, and the other clarifies the list, but at the same time states, "[w]e are not able to provide information on factory overhead expenses as it is not available to us." A.R.Doc. 130. Commerce explains that it proceeded under the reasonable assumption that the controverted statement only expresses the Consulate's inability to quanti-

---

**6.** "Faced with specific price information ... and more general information regarding the relationship between the price of scrap and the cost of raw materials, Commerce decided to use the average of the specific prices noted in the two

cables, or 9 rupees per kilogram, as the best information available." *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon Agency Record* at 22 [hereinafter *Defendant's Memorandum*].

fy specifically the figures in the first telex. The administrative record supports Commerce's rationale in that the second telex was transmitted only after Commerce's numerous requests for a clarification of the first one. A.R.Docs. 128 and 129. In these circumstances, the Court finds that Commerce could reasonably conclude that the statement was not a disclaimer as to the validity of the preceding telex, but was only a reply to Commerce's repeated appeals for a clarification.

Plaintiff further maintains that even if Commerce could consider the telexes as evidence, they are insufficient to support Commerce's finding. It alleges that deducing overhead from two general categories, "depreciation" and "other expenses," out of the six enumerated in the telex reflecting the entire production cost, was improper since they may not encompass all overhead expenses. Plaintiff cites previous investigations involving India which, according to plaintiff, demonstrate Indian companies' irregular accounting practices. '

Plaintiff's challenge rests on the unsubstantiated assumption that the "depreciation" and the "other expenses" categories do not fully reflect overhead expenditure. In the investigations plaintiff summoned to support its argument, the Indian companies' aberrant record-keeping procedure was successfully challenged because the evidence in the records contained glaring accounting errors. *See e.g., Certain Iron Construction Castings from India; Final Determination of Sales at Less Than Fair Value*, 51 Fed.Reg. 9486 (March 19, 1986) (reclassifying warehouse maintenance, repairs, maintenance and depreciation as factory overhead). In the present case, there is no evidence to this effect. Commerce explains that it deduced from the telexes the two categories which, from its past experience, fairly reflected the overhead outlay. *Defendant's Memorandum* at 27–28. Given the absence of any evidence to the contrary, the Court upholds Commerce's overhead findings.

Similarly, the Court cannot sustain plaintiff's alternative allegation that Commerce erred by not adjusting the overhead upward to account for additional expenses necessary in manufacturing TRBs from bars, as opposed to tubes. Commerce could not have reasonably made the overhead adjustments that plaintiff requests from the evidence contained in the record. While the additional heating and hot-forming step in the bar-based manufacturing process may raise overhead through higher fuel consumption, the tube-based manufacturing process' extra green machining step may lead to a corresponding result. A.R. Doc. 116; *Plaintiff's Memorandum* at 37–39; *Defendant's Memorandum* at 32.

The Court observes no legitimate basis in plaintiff's argument that Commerce was required to consider the higher overhead figures for the United States, Japanese, and Brazilian TRB manufacturers. *Freeport Minerals Co. v. United States*, 776 F.2d 1029 (Fed.Cir.1985), has been conspicuously miscited by plaintiff to support its claim that the "market conditions, prices, and the performance of other companies in the product market are relevant to whether [Commerce's] final decision is a reasonable one." *Plaintiff's Memorandum* at 43. A cursory reading of *Freeport* reveals that the opinion noted other companies' business standing only as a background factual matter.[7] Plaintiff's assertion is further without merit because it calls for a comparision of the developed economies' capital-intensive production process with India's labor-intensive method.

Lastly, Commerce concedes that its inadvertent exclusion of excise tax from the Chinese raw material cost, while including it in calculating the Indian overhead, led to a 2.98% undervaluation of the Chinese overhead. Therefore, this Court directs Commerce to consider the upwardly adjusted overhead in conjunction with the recomputed net cost of raw materials to determine whether they alter the negative antidumping duty margin found for CMEC.

---

**7.** The court held that the administering authority must base its revocation of an affirmative

antidumping order on updated data. *Id.* at 1031.

## D. *Due Process*

The standard governing the interested parties' access to information under the statute states that, "[t]he administering authority and the Commission shall, from time to time upon request, inform the parties to an investigation of the progress of that investigation." 19 U.S.C. § 1677f(a)(2) (1982). The legislative history clarifies that an obligation on the administering authority to maintain a record is "for purposes of judicial review," and that the participating parties' right is to be "more fully aware of the presentation of information to the Authority or the ITC." H.R.Rep. No. 317, 96th Cong., 1st Sess. 77.

■ Therefore, plaintiff's claim that its due process rights were violated because it did not have an opportunity to comment on one telex that Commerce received shortly before the issuance of the final determination is without merit. The record is replete with evidence of plaintiff's involvement in the investigation through active correspondence with Commerce; it received and submitted data on contested matters, participated in public hearings, and filed briefs. In view of the foregoing, the Court concludes that plaintiff received adequate procedural rights.

## Conclusion

Upon review of the administrative record, this Court finds that Commerce correctly adopted the constructed value methodology and properly applied the "best information available rule." The Court also sustains Commerce's appraisal of the foreign market value, except with regard to its computation of the net raw material cost and disparate tax treatment. The Court does not find any due process violation. Commerce shall make the necessary adjustments consistent with this opinion and file with the Court within forty-five days a supplemental record explaining its redetermination. Plaintiff will respond to the results on remand within fifteen days from the date of Commerce's filing of its redetermination. Thereafter, defendant has ten days to submit any reply to plaintiff's comments.

SO ORDERED.