**The TIMKEN COMPANY,**
**Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant,**

and

**China National Machinery and Equipment Import and Export Corporation, Defendant–Appellant.**

**No. 89–1490.**

United States Court of Appeals,
Federal Circuit.

Jan. 19, 1990.

Terence P. Stewart, Stewart and Stewart, Washington, D.C., argued for plaintiff-appellee. With him on the brief were Eugene L. Stewart, James R. Cannon, Jr., and Charles A. St. Charles, Washington, D.C. Of counsel was Scott A. Scherff, Canton, Ohio, of The Timken Co.

Lawrence R. Walders, Graham & James, Washington, D.C., argued for defendant-appellant. With him on the brief were Samuel X. Zhang, Eileen S. Carlson, and Brian E. McGill, Washington, D.C.

Before MARKEY, Chief Judge,
RICH, Circuit Judge, and DUMBAULD, Senior District Judge *.

RICH, Circuit Judge.

Defendant–Appellant China National Machinery and Equipment Import and Export Corp. (CMEC) appeals from the March 22, 1989 final judgment of the Court of International Trade (CIT), *Timken Co. v. United States*, 714 F.Supp. 535 (CIT 1989), affirming the U.S. Department of Commerce's (Commerce's) recalculation after remand of an affirmative dumping margin. We affirm.

## BACKGROUND

August 25, 1986, Plaintiff–Appellee The Timken Company (Timken) filed an antidumping duty petition with Commerce, alleging that two companies were selling in the United States tapered roller bearings (TRBs) from the People's Republic of China (PRC) at less than fair value. October 2, 1986, Commerce determined that there was a reasonable indication that TRBs from the PRC were being sold at less than fair value and so on November 4, 1986, issued an antidumping questionnaire to CMEC, who is the only direct exporter of TRBs from the PRC.

After reviewing CMEC's response to the questionnaire, Commerce concluded that the PRC is a state-controlled economy for the purposes of investigation. Pursuant to statute and regulation, Commerce chose a comparable non-state-controlled, market economy in which to determine foreign market value of the TRBs. Commerce chose India as the comparable "surrogate" country. Commerce sent questionnaires to a number of Indian companies, but did not obtain any information which was considered adequate or reliable. Therefore, under 19 CFR 353.8(c), Commerce chose the "constructed value methodology" to calculate the foreign market value of the TRBs.

Under this methodology, Commerce tries to value the Chinese factors of production for TRBs in India, using the best information available for costs in India. Among the factors which must be calculated is the cost of steel, which is the primary material out of which TRBs are made. During the manufacturing process, a certain amount of the raw steel is left over, which can then be resold as scrap. Therefore, the cost of

* Senior Judge Edward Dumbauld, of the Western District of Pennsylvania, sitting by designation.

steel is equal to the raw material cost minus the value of scrap. This appeal centers around the methodology and information used by Commerce to calculate the value of raw steel and scrap.

In particular, Commerce asked the U.S. Consulate in Bombay to obtain information on raw and scrap steel prices in India. The U.S. Consulate responded via telex as follows:

2.  Indian manufacturers of tapered roller bearings are using steel tubes and forged rings or roll rings as a substitute for round steel bars. Indian ex-factory prices of material used in manufacturing bearings on March 10, 1987, are:

| | | |
|---|---|---|
| A. | Steel tube (hot rolled) | rupees 25.00 per Kg. |
| B. | Steel tubes (cold rolled) | rupees 32 to 40.00 per Kg. |
| C. | Forged and rolled rings | rupees 35 to 40.00 per Kg. |
| D. | Strip material for cage | rupees 13 per Kg. |
| E. | Rolled Coils | rupees 30.00 per Kg. |

3.  Ex mill price of steel scrap is rupees 8 to 10 per Kg.

---

In response to further inquiries from Commerce concerning scrap value, the U.S. Consulate sent a second telex, including the following:

Prices of scrap are generally twenty percent of material cost. The Antifriction Bearing Corporation is selling its steel scrap between rupees 8 to 10.

Finally, Commerce obtained a publication called *Statistics for Iron & Steel Industry in India,* which contained prices for various grades of steel in India.

In calculating the net cost of steel used for manufacturing TRBs, Commerce chose the prices contained in the *Statistics* publication (adjusted to account for the higher grade steel used by CMEC) to determine the cost of raw steel, and chose the 8–10 rupee value recited in the second telex to determine scrap value. The particular choice of these two values led to the scrap steel being valued very high relative to the raw steel, resulting in a low estimation of the cost of steel used in the manufacture of TRBs. At least in part because of this low estimation, Commerce found that CMEC was not selling TRBs in the U.S. at less than fair value, and so issued a final negative determination on May 27, 1987.

Timken appealed Commerce's final determination to the CIT. The CIT found error with Commerce's determination of the dumping margin with respect to CMEC and so remanded to Commerce for a redetermination of the dumping margin. *See Timken Co. v. United States,* 699 F.Supp. 300 (CIT 1988). In particular, the CIT noted that by using the value for raw steel from

the *Statistics* publication and the value for scrap from the second telex, the scrap steel was valued at 75.2% of the value of the raw steel. The CIT found that it was error for Commerce to fail to explain the inconsistency between the 75.2% ratio and the 20% ratio also cited in the second telex, and to choose one of the two values from the second telex for scrap while failing to explain the reasons for its choice. *Timken,* 699 F.Supp. at 307. In view of these errors, the CIT concluded that Commerce's final determination was unsupported by substantial evidence.

Upon remand, Commerce asked the U.S. Consulate to further explain the information in the telexes. The Consulate replied that the 8–10 rupee quote for scrap was obtained from the same TRB manufacturer which supplied the values for raw steel, whereas the 20% quote for scrap was supplied by scrap dealers in India. Therefore, upon remand, Commerce used the 8–10 rupee value for calculating the scrap value of the bearing-grade steel used in manufacturing TRBs, and used the 20% value for calculating the scrap value of the remaining steel. In addition, Commerce abandoned use of the *Statistics* publication, and instead used the values for raw steel quoted in the first telex.

Commerce recalculated a dumping margin by CMEC of 4.69%. This recalculation was affirmed by the CIT in its March 22, 1989 decision.

On this appeal, CMEC does not contend that the recalculated dumping margin is

not supported by substantial evidence, but maintains that the CIT erred in concluding that the original Commerce determination was not supported by substantial evidence.

## OPINION

The CIT must uphold Commerce's final determination unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. 1516a(b)(1)(B) (1988). Substantial evidence has been defined to be such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1562 (Fed.Cir. 1984). The existence of substantial evidence must be determined in view of the record as a whole, including "whatever fairly detracts from the substantiality of the evidence." *Id. Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The CIT found that Commerce erred in failing to reconcile the very high ratios of scrap steel value to raw steel value resulting from their calculation with other similar ratios in the record. We agree. As the CIT noted, Commerce's calculations resulted in a ratio of scrap steel value to raw steel value of 75.2% for the bearing grade steel used to make cups and cones. In addition, the ratio for the bearing grade steel used to make rollers came out to be 60.8%, and the ratio for the steel sheets used to make cages came out to be 97.4%.

These values must be contrasted not only with the 20% ratio mentioned in the second telex, but also with evidence in the record that the scrap steel/raw steel ratio in other countries is also much lower; for example 7–15% in the U.S. In essence, Commerce's calculations resulted in the scrap steel being valued at least three to four times higher than that suggested by the other evidence in the record.

This disparity between the ratios resulting from Commerce's calculation and other ratios in the record is not the result of any inconsistency between the 8–10 rupee value and the 20% value in the embassy telex [1], but the result of using a low calculation of raw steel prices from the *Statistics* publication compared to the raw steel prices in the telexes from the U.S. Consulate. Had Commerce used the 8–10 rupee quotation for scrap together with the quotation of raw steel present in the same telex (as was done upon remand from the CIT), the resulting ratios would have been reasonable compared to other ratios in the record.

Faced with such a great disparity between the calculated scrap steel/raw steel ratios and those present elsewhere in the record, Commerce must have some justification, supported by substantial evidence in the record, for valuing CMEC's scrap steel so much higher than in other countries. CMEC argues that such a justification exists because (1) CMEC uses steel bar to produce the TRBs whereas Indian producers use steel tube, and the use of steel bar would result in more scrap being produced; (2) steel tube is more expensive than steel bar, and thus the ratio of scrap steel/raw steel is naturally greater for steel bar than for steel tube; and (3) in CMEC's manufacturing process, the scrap which results from making the cups and cones consists of smaller cylindrical plugs, which can be used by CMEC to make smaller TRBs.

The first justification does not appear to have much merit, since the prices calculated by Commerce were on a *per kilogram basis,* and thus the fact that more scrap is produced in CMEC's process is irrelevant. As for the second justification, while it might provide reason for a high scrap steel/raw steel ratio for the bearing-grade steel used to make cups, cones and rollers, it provides no basis for valuing the sheet steel scrap resulting from making the

---

**1.** Both parties devote much of their briefs to discussing whether or not Commerce erred in choosing the 8–10 rupee figure for scrap steel over the 20% value reported in the same telex. We do not consider the issue to be very relevant, since the two figures are not greatly inconsistent. As Commerce correctly assumed, the

8–10 rupee figure was based on bearing grade steel. The first telex quoted bearing grade steel at between 32 and 40 rupees per Kg. Thus, the ratio of the bearing grade scrap price (8–10 rupees) to the raw bearing grade steel price (32–40 rupees) is not much different than the 20% value quoted in the telex.

cages at 97.4% that of the raw steel. Likewise, the third justification might provide a reason for a high ratio with respect to the steel used for cups and cones, but provides no basis for the high ratios for the cages and the rollers.

However, it is not really necessary to decide the merits of these justifications, since there is absolutely no evidence in the record to indicate that Commerce actually took these justifications into account when it calculated the price of raw and scrap steel. The first mention of these justifications appears in Commerce's appeal brief before the CIT. "[A]gency action cannot be sustained on *post hoc* rationalizations supplied during judicial review." *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 709–710 (D.C.Cir.1977) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1942) (Agency action "cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order.")). Not only is there no evidence to indicate that Commerce took the suggested justifications into account, but the lack of correlation between the calculated scrap steel/raw steel ratios and the suggested justifications indicates that Commerce did not, in fact, have these considerations in mind when it calculated the raw steel and scrap steel prices.

The sources which Commerce originally chose to use in calculating raw steel and scrap steel prices resulted in a scrap steel/raw steel ratio which was not supported by substantial evidence in the record as a whole. Therefore the CIT was correct in remanding to Commerce for a new determination, and we affirm.

AFFIRMED.