**EMERSON POWER TRANSMISSION CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant,**

**The Torrington Company; Federal–Mogul Corporation, Defendant–Intervenors.**

**Slip Op. 95–155.**
**Court No. 92–07–00480.**

United States Court of International Trade.

Sept. 1, 1995.

Baker & McKenzie (Kevin M. O'Brien and Michael A. Lawrence), Washington, DC, for plaintiff.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Marc E. Montalbine) of counsel: Stephen J. Claeys and David J. Ross, Attorneys, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

Frederick L. Ikenson, P.C., Washington, DC (Frederick L. Ikenson, Larry Hampel, Silver Springs, MD, and Joseph A. Perna, V, Springfield, PA), for defendant-intervenor Federal–Mogul Corporation.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., John M. Breen and Patrick J. McDonough), Washington, DC, for defendant-intervenor The Torrington Company.

## OPINION

TSOUCALAS, Judge:

Plaintiff Emerson Power Transmission Corporation is an importer of antifriction bearings ("AFBs"). Plaintiff challenges the final results of the administrative review issued by the United States Department of Commerce, International Trade Administration ("Commerce"), concerning AFBs and parts thereof from Japan. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews ("Final Results")*, 57 Fed.Reg. 28,360 (June 24, 1992).

### Background

On June 28, 1991, Commerce initiated an administrative review of the antidumping duty order on ball bearings, cylindrical roller bearings, spherical plain bearings, and parts thereof from Japan, for the period of May 1, 1990 to April 30, 1991. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Initiation of Antidumping Administrative Reviews*, 56 Fed.Reg. 29,618 (June 28, 1991).

On March 31, 1992, Commerce published the preliminary determination of its second administrative reviews, for the period of May 1, 1990 to April 30, 1991. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews*, 57 Fed.Reg. 10,868 (March 31, 1992).

On June 24, 1992, Commerce published the final results of its second administrative reviews. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France; et al.; Final Results of Antidumping Duty Administrative Reviews*, 57 Fed.Reg. 28,360 (June 24, 1992).

Emerson moves pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record, alleging the following actions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) use of best information available ("BIA") where Nippon Pillow Block Sales Co. ("Nippon") failed to provide home market sales data; and (2) use of "all others" rate under second-tier BIA to compute the dumping margin for Nippon.

*Discussion*

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

▮ The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on the grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### 1. *Use of BIA*

Emerson contends that Commerce improperly resorted to BIA to calculate Nippon's antidumping margin rate. According to Emerson, Nippon submitted all of the information requested by Commerce, including the home market sales data. *Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record ("Plaintiff's Brief")* at 10. Emerson asserts that Nippon complied with the instructions in the questionnaire supplied by Commerce requiring Nippon to report its home market sales. The questionnaire, as amended, instructed:

> If your firm made more than 2,000 home market … sales of a particular class or kind of the subject merchandise during the period of review, then report sales in the following months of bearing families and part types (e.g., inner races, rolling elements) corresponding to those bearings and part types sold in your U.S. sales listing (both PP and ESP).
>
> Sample dates are as follows:
> 1. March, 1990
> 2. May, 1990
> 3. July, 1990
> 4. October, 1990
> 5. November, 1990
> 6. January, 1991
> 7. March, 1991
> 8. May, 1991

*Questionnaire,* PR Document No. 26 at 12–13 ("Questionnaire"), *amended by Questionnaire Clarifications/Corrections,* PR Document No. 31 at 2. Emerson claims that Nippon correctly interpreted the above instructions to require Nippon to report home market sales for only those months corresponding to the months in which Nippon reported United States exporter's sales price ("ESP") sales. *Plaintiff's Brief* at 7. Emerson supports the methodology used by Nippon to report home market sales, whereby, if there were no home market sales in the sample month corresponding to the ESP sale during that month, Nippon reported home market sales in either the prior sample month or the immediately following sample month. *Plaintiff's Brief* at 15.

According to Emerson, Nippon also correctly reported home market sales for purposes of comparing them to purchase price ("PP") sales. Emerson maintains that since PP sales were reported in their entirety, as opposed to for selected sampled months, Nippon correctly reported home market sales in the same months for the same bearing families as the months in which it reported PP sales. Emerson maintains that Nippon provided sufficient information since if no home market sales were made in the same month as PP sales, Nippon reported home market sales from either 90 days prior to the PP sale or 60 days subsequent to the PP sale. *Id.* at 15–16. Emerson asserts that the 90/60–day methodology used by Nippon was consistent with both the instructions in the questionnaire and the methodology used by Commerce in the first administrative review. *Id.* at 16–17.

Emerson further suggests that even if Nippon did not comply with the instructions in the questionnaire, Nippon's interpretation was reasonable. *Id.* at 17.

According to Emerson, even if Nippon's interpretation were unreasonable, Commerce

should not have completely rejected the questionnaire response in favor of using BIA. *Id.* at 18. Emerson concedes that the information requested by Commerce would be necessary to compute annual averages to determine foreign market value (FMV). *Id.* at 20. Emerson maintains, however, that the data supplied by Nippon was sufficient to compute monthly averages and, if used by Commerce, would yield more accurate results. *Id.*

Emerson also asserts that Commerce should not have rejected Nippon's submission of the missing data on March 6, 1992 as being unsolicited and untimely. *Id.* at 21. Conceding that Nippon submitted the information after regulatory guidelines and that Commerce did not request the information, Emerson argues that Commerce should have requested the information. *Id.* at 22.

Commerce responds that it correctly resorted to use of BIA, because Nippon failed to report approximately 80% of its home market sales. *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Defendant's Brief")* at 22. *See also Final Results,* 57 Fed.Reg. at 28,380 (Comment 1). Commerce's position is that Nippon did not comply with Commerce's request for information. *Defendant's Brief* at 23. In addition, Commerce asserts that the questionnaire instructions did not limit the home market sales reporting requirement to only those sales contemporaneous to Unites States sales. *Id.* at 24.

Commerce contends that it notified Nippon and all interested parties of its intent to use annual-weighted average sales to compute FMV, and to eliminate the 90/60–day methodology for the second administrative review by letter dated August 1, 1991. *Id.* at 32. *See also* PR Document No. 10. Commerce further argues that even if Nippon believed it only had to report contemporaneous sales, the glossary accompanying the questionnaire defined "contemporaneous sales" for annual average foreign market sales as follows:

> If we determine that it is appropriate to use annual weighted-average home market prices ... contemporaneous sales are sales in *any* month of the 12–month review peri-

od (*or the sample months* in the period if HM ... sampling is applicable for that class or kind).

*Id.* at 32 (emphasis supplied). *See also Questionnaire* at 39. Commerce maintains that the methodology used by Nippon was inconsistent with the above definition.

In addition, Commerce asserts that if Nippon found the questionnaire instructions to be ambiguous, it should have complied with the directions contained in the cover letters accompanying both the questionnaire and the corrections by contacting Commerce with any questions. *Defendant's Brief* at 35. Commerce also argues that the instructions could not have been unclear since all of the other respondents responded appropriately. *See Final Results,* 57 Fed.Reg. at 28,381.

Commerce responds that it was not required to accept Nippon's post-verification submission because it was untimely and unusable. *Defendant's Brief* at 37–38. Commerce asserts that the submission by Nippon occurred after the deadlines imposed by Commerce's regulations which state that it may accept information until "the earlier of the date of publication of notice of preliminary results of review or 180 days after the date of publication of notice of initiation of the review." 19 C.F.R. § 353.31(a)(1)(ii) (1992). Commerce also maintains that pursuant to its regulations, it does not accept unsolicited information. *See* 19 C.F.R. § 353.31(b)(2) (1992). Finally, Commerce states that it could not verify the data since it was submitted after the verification. *Defendant's Brief* at 39.

Torrington and Federal–Mogul essentially support Commerce's decision to use BIA to determine Nippon's antidumping margin rate. *Memorandum of The Torrington Company in Opposition to Plaintiff's Motion for Judgment on the Agency Record* at 10–16; *Opposition of Federal–Mogul Corporation, Defendant–Intervenor, to Plaintiff's Motion for Judgment Upon the Agency Record* at 8–16.

■ Section 1677e(c) of Title 19, U.S.C., states that Commerce "shall, whenever a party or any other person refuses or is unable to produce information requested in a

timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." In addition, Commerce's regulations instruct the Secretary to use BIA whenever Commerce:

(1) Does not receive a complete, accurate, and timely response to the Secretary's request for factual information; or

(2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.

19 C.F.R. § 353.37(a) (1992).

Emerson's argument that Commerce improperly applied BIA because Nippon provided all requested information in the questionnaire is without merit. This Court finds that Nippon's failure to comply with the instructions in the questionnaire supports Commerce's decision to resort to use of BIA.

The language of the questionnaire does not limit the reporting of home market sales to those months in which there were contemporaneous United States sales. The instructions required Nippon to report home market sales "*in the following months* of bearing and part types ... corresponding to those bearings and part types sold in [Nippon's] U.S. sales listing." *Questionnaire* at 12 (emphasis added). The word "corresponding" refers to the bearings and part types of ESP sales rather than the months in which ESP sales were reported. The instructions clearly require the respondent to report sales in the listed months for all bearings and part types that correspond to the bearings and part types reported for ESP sales. The instructions do not require the dates or months of the home market and U.S. sales to correspond.

Furthermore, the fact that Commerce required a reporting of home market sales in all of the listed months is supported by the letter Commerce sent to all interested parties dated August 1, 1991 concerning the methods Commerce proposed to use in the second administrative review. PR Document No. 10. In that letter Commerce stated the following:

We intend to eliminate 90/60–day contemporaneous sales matching and instead use annual average FMVs where annual average FMVs are appropriate.... Annual average FMVs will only be used after we determine that home market prices are stable across the review period.

*Id.* at 1–2. Therefore, Nippon's use of the 90/60–day methodology and reporting of only contemporaneous sales was inconsistent with Commerce's methodology. Furthermore, Nippon's assertion that its responses were adequate for computing monthly averages is contrary to Commerce's stated intention to use annual-weighted averages. While this Court finds that the questionnaire instructions were clear on its face, this letter further supports Commerce's assertion that Nippon's interpretation of the instructions was unreasonable.

■ Nippon's argument that even if its interpretation were unreasonable, Commerce should not have resorted to use of BIA because the information was only marginally necessary is also without merit. The regulations direct Commerce to use BIA whenever it does not receive "complete" and "accurate" information. 19 C.F.R. § 353.37(a)(1) (1992). In addition, in *Ansaldo Componenti, S.p.A. v. United States*, 10 CIT 28, 37, 628 F.Supp. 198, 205 (1986), this court stated: "It is Commerce, not the respondent, that determines what information is to be provided for an administrative review." This court further acknowledged:

[I]nformation sought in section 751 reviews may have a significance wholly independent from its proffered use, and respondents may be reluctant to share material they deem irrelevant to such reviews. However, the consequence of failing to provide adequate and timely information is to leave Commerce with no alternative but to proceed with its review relying upon the best information available.

*Ansaldo Componenti*, 10 CIT at 38, 628 F.Supp. at 206. In *Mitsubishi Heavy Indus., Ltd. v. United States*, 17 CIT 1024, 833 F.Supp. 919 (1993), this court relied on *Ansaldo* in concluding that Commerce properly resorted to BIA after Mitsubishi failed to supply Commerce with data on sales between Mitsubishi dealers and end users. Citing *Ansaldo*, this court disapproved of Mitsubi-

shi's attempt to make "unilateral decisions concerning the necessity of information requested by Commerce." 17 CIT at 1024, 833 F.Supp. at 925. Thus, even if the information requested seemed irrelevant to Nippon, the failure to provide Commerce with the information justified the use of BIA.

█ Finally, Commerce was justified in not accepting Nippon's submission on March 6, 1992. In its letter rejecting the late submission, Commerce stated its reasoning as follows:

> Upon discovering the existence of unreported home market sales during the verification of NPBS, the verification team requested the company to provide information regarding the unreported sales. However, NPBS declined to provide this information and suggested that the verification team estimate the number of unreported sales from information already on the record. The verification team did not request any post-verification submission of data regarding these sales, and we are unable to use information that was not subject to verification for our calculations of the results of review.

PR Document No. 657.

Commerce's regulations clearly state the time limits for submission of factual information as follows:

> [S]ubmissions of factual information for the Secretary's consideration shall be submitted not later than:
>
> . . . .
>
> (ii) For the Secretary's final results of an administrative review ... the earlier of the date of publication of notice of preliminary results of review or 180 days after the date of publication of notice of initiation of the review; ...
>
> . . . .
>
> (3) The Secretary will not consider in the final determination or the final results ... any factual information submitted after the applicable time limit.

19 C.F.R. § 353.31(a)(1)(ii), (a)(3) (1992). The submission by Nippon on March 6, 1992 occurred more than 180 days after the June 28, 1991 publication of notice of the initiation of review. The fact that the submission was made prior to the preliminary determination published on March 31, 1992 is irrelevant since the regulations state that the earlier date controls. In addition, while Commerce has the authority to request information pursuant to 19 C.F.R. § 353.31(b) (1992), the regulations state that the Secretary "normally will not consider or retain in the record of the proceeding unsolicited questionnaire responses." 19 C.F.R. § 353.31(b)(2) (1992). Commerce offered Nippon an opportunity to correct the questionnaire and supply the missing information during verification, and Nippon failed to do so. Commerce did not request any further information after the verification. Commerce, therefore, properly rejected the submission as an unsolicited and untimely response.

In general, this court has upheld Commerce's rejection of untimely submitted factual information pursuant to 19 C.F.R. § 353.31(a). *See, e.g., NSK Ltd. v. United States,* 16 CIT 745, 750, 798 F.Supp. 721, 725 (1992), *aff'd,* 996 F.2d 1236 (Fed.Cir.1993); *Asociacion Colombiana de Exportadores v. United States,* 13 CIT 13, 28, 704 F.Supp. 1114, 1124 (1989), *aff'd,* 901 F.2d 1089 (Fed. Cir.1990); *Seattle Marine Fishing Supply Co. v. United States,* 12 CIT 60, 71, 679 F.Supp. 1119, 1128 (1988). While Emerson is correct to assert that Commerce may request additional information, *Plaintiff's Brief* at 22, Emerson's argument that Commerce should have requested the information is inconsistent with Commerce's broad discretion under the antidumping laws. This court has noted that "[t]he administering agency has great discretion in carrying out the antidumping laws." *Seattle Marine,* 12 CIT at 71, 679 F.Supp. at 1128. In *Seattle Marine,* the court rejected plaintiffs' argument that Commerce should have accepted information submitted after deadlines set by Commerce. The court found that where plaintiffs failed to respond fully in the questionnaires, Commerce properly refused to consider untimely filed responses and instead relied on BIA. *Seattle Marine,* 12 CIT at 71, 679 F.Supp. at 1128. The court specifically addressed the plaintiffs' assertions as follows: "The fact that plaintiffs are able to determine for Commerce what constitutes a proper time for

verification, what constitutes a 'timely submission,' and what should be accepted, despite the statute, is interesting, at best." *Id.* Similarly, Emerson's contention in the present case that Commerce should have requested the information and, therefore, should accept an untimely filing ignores the plain language of the regulations and the broad discretion of Commerce. Accordingly, this Court finds that Commerce's rejection of the untimely and unsolicited submission was consistent with law.

In sum, this Court finds that Commerce's use of BIA is supported by substantial evidence and in accordance with law.

### 2. *Use of "All Others" Rate*

■ Emerson asserts that even if Commerce was justified in using BIA, its determination of Nippon's dumping margin as being 45.83% based upon the "all others" rate under the second-tier formula was improper. Emerson contends that Commerce should have calculated the margin based on the highest non-BIA rate for the second administrative review. *Plaintiff's Brief* at 27. Emerson claims that the Court of Appeals for the Federal Circuit ("CAFC") in *Allied–Signal Aerospace Co. v. United States ("Allied–Signal I")*, 996 F.2d 1185, 1190–91 (Fed.Cir. 1993), implied that the rate assignable for second-tier BIA would be the highest rate found for any company in these reviews. Emerson relies on the following passage from *Allied–Signal I* to support its claim:

> The critical difference in BIA treatment under the first and second tiers lies in the range of LTFV margins subject to consideration as the best information available. Under the first tier, the ITA may consider the margin of any company involved in the prior LTFV investigation. *Under the second tier, the ITA may only consider a particular firm's own prior LTFV rate. . . .* Although each tier requires the ITA to choose the higher of a certain LTFV rate and the highest review rate, the ITA has acknowledged that in practice, 'generally the highest rate for any company from the less than fair value (LTFV) investigation' is used for the best information available under the first tier and that

> *under the second tier, 'generally the highest rate found for any company in these reviews' is used.* 56 Fed.Reg. 11179.

996 F.2d at 1191 (emphasis added). Emerson calculates that the applicable rate under this approach would be 16.71% as opposed to 45.83%. *Plaintiff's Brief* at 27.

Emerson also contends that the two-tier system is merely a guideline, and that Commerce should have considered other factors in determining the applicable rate. *Plaintiff's Brief* at 27–30. In sum, Emerson maintains that Commerce did not consider Nippon's cooperation with the investigation, and that the rate applied by Commerce was not representative of the actual margin because Commerce rejected all of the information supplied by Nippon in favor of total BIA and the "all others" rate.

Commerce responds that its methodology was consistent with the two-tier methodology described in *Allied–Signal I*. Commerce states that it applied the less adverse second-tier analysis to Nippon in arriving at the 45.83% rate. Commerce supports its decision to reject Nippon's response completely by arguing that the use of only 20% of the home market sales would reward Nippon for its failure to report the requested information. *Defendant's Brief* at 48. Commerce also rejects Emerson's assertion that it should base FMV on constructed value rather than BIA because such an approach would permit a respondent whose actual sales information is more adverse than its constructed value information to dictate the results of the review by not responding to the home market sales portions of Commerce's questionnaire. *Id.* at 50.

Commerce also responds to the factors Emerson listed as relevant. *Id.* at 51–53. Commerce claims that Nippon's cooperation was considered when Commerce chose to apply the second-tier BIA rate as opposed to the first-tier BIA rate that is used for uncooperative respondents. Commerce dismisses Emerson's claims that the missing data would not have produced more accurate calculations than the partial information as being pure speculation. Finally, Commerce asserts that it properly applied the "all others" rate from the less than fair value

("LTFV") investigation that was used in the first administrative review. Commerce contends that the BIA rule is a rule of adverse inference and, therefore, it properly presumed that Nippon would have supplied complete home market sales data if the result would have been a lower rate than the rate from the first administrative review.

In the Final Results, Commerce made the following statement regarding the use of the second-tier BIA rate:

> When a company substantially cooperated with our requests for information including, in some cases, verification, but failed to provide the information requested in a timely manner or in the form required, we use as BIA the higher of (1) the highest rate (including the "all others" rate) ever applicable to the firm for the same class or kind of merchandise from either the LTFV investigation or a prior administrative review; or (2) the highest calculated rate in this review for the class or kind of merchandise for any firm from the same country of origin.
>
> . . . .
>
> ... [B]ecause NPBS attempted to submit some information, we applied the second tier of BIA as described above. For these final results, for NPBS that rate is 45.83 percent, which is the firm's rate from the previous review.

*Final Results,* 57 Fed.Reg. at 28,379.

The approach adopted by Commerce was specifically sustained by the CAFC in *Allied–Signal Aerospace Co. v. United States* ("*Allied–Signal II*"), 28 F.3d 1188 (Fed.Cir. 1994). In that case, the court upheld Commerce's application of the "all others" rates from the LTFV investigation even though the rates were higher than any rates calculated in the review period. *Allied–Signal II,* 28 F.3d at 1191. In *Allied–Signal II* the plaintiffs' arguments were identical to Emerson's assertions. Allied–Signal argued that Commerce should have used either SNFA's (a French manufacturer of customized aerospace bearings) own LTFV rate or the highest rate calculated in the administrative review. Similar to Nippon, SNFA did not have its own rate calculated in the prior LTFV investigation. Allied Signal relied on the

same language from *Allied–Signal I* as Emerson to support its argument. The court, however, referred to Allied–Signal's argument as "a poorly disguised attempt to reargue what has already been decided in *Allied–Signal I.*" *Allied–Signal II,* 28 F.3d at 1190. The CAFC explained its reasons for rejecting Allied–Signal's argument as follows:

> By taking a sentence in the opinion completely out of the context in which it was written, Allied–Signal distorts its meaning and purpose. The paragraph in *Allied–Signal I* upon which Allied–Signal relies is part of a general discussion comparing the two tiers of the ITA's BIA methodology. In that discussion, we recognized that the basic distinction between the two tiers lies in subdivision (1) of each tier. In the first tier, subdivision (1) provides the highest of the LTFV rates found for any firm can be used. In contrast, *subdivision (1) of the second tier limits the applicable LTFV rate to the firm's own rate, assuming there is one. However, the latter subdivision contains an explicit provision instructing that 'if the firm was not individually investigated,' the 'all others' rate from the LTFV investigation is to be considered. The ITA's inability to use the firm's own rate thus does not mandate use of the highest rate calculated in the administrative review.*

*Id.* (emphasis added). Accordingly, this Court finds Emerson's assertion that Commerce should not have used the "all others" rate without merit. Since Nippon was not individually investigated, Commerce appropriately used its discretion in applying the "all others" rate from the LTFV investigation.

 This Court also agrees with Commerce that the factors listed by Emerson are not relevant to Commerce's choice to use the "all others" rate. Commerce already considered Nippon's cooperation with the investigation in its decision to apply second-tier BIA analysis as opposed to first-tier BIA analysis. *Final Results,* 57 Fed.Reg. at 28,379. Moreover, whether or not the missing data would have produced more accurate results is pure speculation. In *Allied–Signal I,* the CAFC noted that "because Congress has 'explicitly

left a gap for the agency to fill' in determining what constitutes the best information available, the ITA's construction of the statute must be accorded considerable deference." 996 F.2d at 1191, quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). Emerson's argument that Commerce should have used other data to compute BIA misses the point that Commerce has broad discretion in determining what information to use once it establishes that the application of BIA is appropriate. The BIA scheme establishes a presumption that the highest prior margins are the best information available. *Allied–Signal I*, 996 F.2d at 1191, citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed.Cir.1990). This presumption may be rebutted by the respondent with evidence showing the actual margin to be less. *Id.* Emerson did not produce evidence showing that Nippon's actual margin would be less. Emerson merely speculates that if Nippon's rate had been calculated it would be less than the "all others" rate applied. Emerson relies on the rates calculated for the other companies that participated in the review to conclude that Nippon's rate would be lower than 45.83%. *Plaintiff's Brief* at 31–32. This argument was specifically rejected in *Allied–Signal II* where the CAFC upheld Commerce's determination of the dumping margins for SNFA of 65.13% and 17.31% to sales of ball bearings and cylindrical roller bearings, respectively, where the highest rates calculated in the administrative review were 7.79% and 10.63%. *Allied–Signal II*, 28 F.3d at 1190–91. Therefore, Emerson's reliance on the fact that the highest non-BIA rate calculated in these reviews is 16.71% is misplaced. Commerce's actions were consistent with the two-tier methodology upheld in *Allied–Signal II*.

Accordingly, this Court finds that Commerce's use of the "all others" rate as BIA is supported by substantial evidence and in accordance with law.

### Conclusion

In accordance with the foregoing opinion, this Court, after due deliberation and a review of all papers in this action, finds that Commerce's actions were in accordance with law and supported by substantial evidence. For the reasons stated above, the Final Results are affirmed and plaintiff's motion is denied in all respects. This case is hereby dismissed.