SLIP OP. 00-125

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ——————————————————— : | |
| : | |
| ACCIAI SPECIALI TERNI S.p.A. and : | |
| ACCIAI SPECIALI TERMI USA : | |
| : | |
| Plaintiffs, : | |
| : | **Before:  WALLACH, Judge** |
| v. : | **Court No.:  99-06-00363** |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant : | |
| : | **PUBLIC VERSION** |
| and : | |
| : | |
| ALLEGHENY LUDLUM CORP., <u>et al.</u>, : | |
| : | |
| Defendant-Intervenors. : | |
| ——————————————————— : | |

[Plaintiffs' Motion For Judgment Upon The Agency Record Under USCIT R. 56.2 denied]

Decided:  October 2, 2000

<u>Hogan & Hartson L.L.P.</u> (<u>Lewis E. Leibowitz</u>, <u>Lynn G. Kamarck</u> and <u>Craig A. Lewis</u>), for Plaintiffs.

<u>Lyn M. Schlitt</u>, General Counsel; <u>James A. Toupin</u>, Deputy General Counsel; U.S. International Trade Commission, Office of the General Counsel, (<u>Karen Veninga Driscoll</u>), for Defendant.

<u>Collier Shannon Scott, PLLC</u> (<u>David A. Hartquist</u>, <u>Paul C. Rosenthal</u>, <u>Kathleen W. Cannon</u> and <u>R. Alan Luberda</u>), for Defendant-Intervenors

## <u>OPINION</u>

## I

## INTRODUCTION

This case is before the court upon Plaintiffs' Motion For Judgment Upon The Agency Record

Under USCIT R. 56.2, challenging the decision of the U.S. International Trade Commission ("ITC" or "Commission") in Certain Stainless Steel Plate From Belgium, Canada, Italy, Korea, South Africa, and Taiwan, Inv. Nos. 701-TA-376, 377, and 379 (Final) and 731-TA-788-793 (Final), USITC Pub. 3188 (May 1999), 64 Fed. Reg. 25,515 (May 12, 1999) ("Plate Final Determination"). Plaintiffs allege that the ITC committed both legal and factual errors in limiting the "domestic like product" to stainless steel flat-rolled products that are 4.75 mm. or more in thickness. According to Plaintiffs, the domestic like product should include all annealed and pickled stainless steel flat products, regardless of thickness. For the reasons stated below, the court rejects Plaintiffs' challenge and sustains the Plate Final Determination.

## II

## BACKGROUND

In response to a petition by the affected U.S. industry, on May 28, 1998, the ITC published in the Federal Register a notice of its preliminary determination that there was "a reasonable indication" that a U.S. industry was materially injured by reason of dumped or subsidized imports of stainless steel plate in coils (i.e., stainless steel flat-rolled products 4.75 mm. or more in thickness) from Belgium, Canada, Italy, Korea, South Africa, and Taiwan. Certain Stainless Steel Plate From Belgium, Canada, Italy, Korea, South Africa, and Taiwan, 63 Fed. Reg. 29,251 (1998). Following subsequent findings by the International Trade Administration of the U.S. Department of Commerce ("Commerce") that such stainless steel plate was, in fact, being subsidized and/or dumped in the U.S. market, the ITC

commenced the investigation that is the subject of Plaintiffs' challenge.[1]

For purposes of its investigations, Commerce defined the dumped and/or subsidized merchandise as "flat-rolled products, 254 mm or over in width and 4.75 mm or more in thickness, in coils, and annealed or otherwise heat treated and pickled or otherwise descaled."[2] As in all injury determinations, in this case the ITC was required to define one or more "domestic like products," and one or more "domestic industries" producing those like products, that correspond to the imported merchandise identified by Commerce.[3] See 19 U.S.C. § 1677(4)(A), (10) (1994) (defining terms). In its preliminary determination, the ITC examined a proposal by various respondents to define the domestic like product more broadly than the subject merchandise identified by Commerce, such that it would constitute all annealed and pickled stainless steel hot-rolled coiled products, regardless of

---

[1] Under the Tariff Act of 1930, U.S. industries may petition for relief from imports that are sold in the United States at less than fair value ("dumped") or which benefit from subsidies provided through foreign government programs. Under the law, Commerce determines whether the dumping or subsidizing exists and, if so, the margin of dumping or amount of the subsidy. The ITC determines whether the dumped or subsidized imports materially injure or threaten to materially injure the U.S. industry or industries.

[2] See Certain Stainless Steel Plate From Belgium, Canada, Italy, Korea, South Africa, and Taiwan, Inv. Nos. 701-TA-376-379 (Preliminary) and 731-TA-788-793 (Preliminary), USITC Pub. 3107 (May 28, 1998) ("Plate Preliminary Determination" or "Plate Prelim. Determ.") at 4 (quoting Initiation of Antidumping Duty Investigations: Stainless Steel Plate in Coils from Belgium, Canada, Italy, Republic of South Africa, South Korea and Taiwan, 63 Fed. Reg. 20580, 20581 (1998).

[3] Although the ITC must accept Commerce's determination as to the scope of the imported merchandise found to be subsidized or sold at less than fair value, the Commission determines what domestic product or products is like the imported articles Commerce identified. See Hosiden Corp. v. United States, 85 F.3d 1561, 1567 (Fed. Cir. 1996) ("Both the Court of International Trade and this court have long recognized that for injury determinations the 'class or kind' and 'like product' determinations required by the statute need not be consistent.").

thickness.  Plate Prelim. Determ. at 10.  Applying its traditional six-factor analysis,[4] the Commission found that "[w]hile some factors support a single like product continuum, it is not clear where the dividing line occurs with these products."  Id. at 13.  Accordingly, the ITC decided not to include hot-rolled sheet and strip of less than 4.75 mm. in thickness (i.e., "sheet and strip") in its preliminary determination.  Id.  The Commission noted, however, that "we intend to explore in any final investigations whether hot-rolled . . . sheet and strip should be included in the definition of the domestic like product."  Id.

Subsequent to this preliminary determination, but prior to the Plate Final Determination, the ITC issued its preliminary determination in an investigation involving subject imports of stainless steel flat-rolled products of less than 4.75 mm. in thickness.  See Certain Stainless Steel Sheet and Strip from France, Germany, Italy, Japan, the Republic of Korea, Mexico, Taiwan, and the United Kingdom, Inv. Nos. 701-TA-380-382 and 731-TA-797-804 (Preliminary), USITC Pub. 3118 (Aug. 1998) ("Sheet and Strip Preliminary Determination" or "Sheet and Strip Prelim.").  As in the Plate Preliminary Determination, various foreign respondents requested that the "domestic like product" cover all hot-rolled, annealed and pickled stainless steel products, regardless of thickness (i.e., sheet and strip and plate).  Id. at 5 & n.18.  Although acknowledging, inter alia, its recent decision in the "plate" investigation, the Commission stated that it "is not bound by prior determinations concerning similar imported products."  Id. at 6 n.19.  Accordingly, the ITC applied anew its six factor analysis, finding that

_____

    [4] These six factors were:  (1) physical appearances and uses, (2) interchangeability, (3) channels of distribution, (4) customer and producer perceptions, (5) common manufacturing facilities and employees, and (6) price.  See Plate Prelim. Determ. at 11-13.

Although all flat stainless products share similar chemical compositions and properties, the industry has established a specific thickness-based distinction between plate on the one hand, and sheet and strip, on the other. To a large degree, these distinctions correspond to different end uses and channels of distribution, and result in limited interchangeability. While sheet and plate generally are produced by similar, and sometimes, common initial manufacturing processes and equipment, virtually all sheet and strip undergoes the more extensive additional processing of cold-rolling before being sold for end use. The cold-rolling process used to finish sheet and strip entails the use of different employees and equipment from that used for hot-rolling, and is usually performed in different facilities, and in some instances, by different producers. The additional processing adds substantial value to the sheet and strip and results in different pricing practices from those used for plate. For these reasons, we do not include plate in our definition of the domestic like product.

Id. at 9. In a concluding footnote, the Commission related these findings to its Plate Preliminary Determination, noting that both investigations addressed "virtually the same like product issue" and that "[a]dditional information in the record of the instant investigations further supports the Commission's preliminary conclusion in Plate not to expand the like product to include [stainless steel sheet and strip] in that case, and vice versa in these preliminary investigation phases." Id. at 9 n.51.

Approximately nine months after issuing its Sheet and Strip Preliminary Determination, the Commission released the Plate Final Determination at issue here. Again addressing the domestic like product question, the ITC noted that after "performing a detailed comparison of stainless steel plate in coils and stainless sheet and strip applying the traditional like product factors" in the Sheet and Strip Preliminary Determination, it "reaffirmed its preliminary determination from the instant investigation that [plate and sheet and strip] are not the same domestic like product." Plate Final Determination at 5. After summarizing its Sheet and Strip Preliminary Determination findings in a footnote, the Commission stated that "[t]here is no new information in the record of these investigations that leads us to question the Commission's reasoning in the [Sheet and Strip Prelim.]." Id. Thus, "for the reasons set forth in the

[Sheet and Strip Prelim.]," the ITC concluded that the domestic like product did not include stainless steel sheet and strip. Id.

Plaintiffs challenge this finding on both legal and factual grounds, arguing, inter alia, that (a) the ITC failed to broadly define the "like product" and attached too much weight to the scope of the imported merchandise defined by Commerce; (b) the ITC improperly used facts developed in the Sheet and Strip Preliminary Determination to support its like product determination; (c) the ITC abused its discretion in failing to collect essential data from U.S. purchasers; (d) the facts identified by the ITC do not otherwise show a clear dividing line between stainless steel plate and stainless steel sheet and strip. Each of these arguments is addressed below.

### III

### STANDARD OF REVIEW

In reviewing the Plate Final Determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Substantial evidence is something more than a "mere scintilla," and must be enough evidence to reasonably support a conclusion. Primary Steel, Inc. v. United States, 17 CIT 1080, 1085, 834 F. Supp. 1374, 1380 (1993); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." Ceramica Regiomontana, S.A., 10

CIT at 404-5, 636 F. Supp. at 966.

**IV**
**ANALYSIS**

**A**
**PLAINTIFFS' HAVE NOT IDENTIFIED ANY LEGAL**
**ERRORS IN THE COMMISSION'S DETERMINATION.**

In their initial brief, Plaintiffs argue that the ITC's like product determination was not in accordance with law for two reasons. First, Plaintiffs assert that the narrow "domestic like product" definition adopted by the ITC is inconsistent with the relevant statute (19 U.S.C. § 1677(10)), judicial precedent, and the Commission's own practice. See Plaintiffs' Brief In Support Of Motion For Judgment On The Agency Record Under USCIT R. 56.2 ("Plaintiffs' Brief") at 10-11. In support, Plaintiffs cite the legislative history of § 1677(10), prior decisions of this court, and the Plate Final Determination itself as authority for the proposition that the "'[d]omestic like product' is to be broadly defined to ensure that the Commission consider injury to all domestic producers that produce products which directly compete with the [subject] imported merchandise . . . ." Id. at 10. Here, Plaintiffs assert, the ITC "failed to adequately explain, much less justify, how a thickness of 4.75 mm. constitutes [a] 'clear dividing line'" among possible like products. Id. at 11. "Since the Commission failed to meet this burden," Plaintiffs claim, "the Commission's narrow definition of like product is inconsistent with its own acknowledged practice." Id.

On its face, Plaintiffs' argument appears to attack the justification employed by the ITC for finding a distinction between stainless steel plate and stainless steel sheet and strip. Insofar as this is true, however, Plaintiffs assert not a legal challenge per se, but an attack on the factual justification (i.e.,

evidence) underlying the Commission's conclusion. See, e.g., Torrington Co. v. United States, 14 CIT 648, 651, 747 F. Supp. 744, 749 (1990), aff'd 938 F.2d 1278 (Fed. Cir. 1991) ("Whether the differences among the various bearings are minor or significant is a factual issue for the Commission to decide."); NEC Corp. v. Dep't of Commerce, 36 F. Supp.2d 380, 383 (CIT 1998) ("The Commission's decision regarding the appropriate domestic like product is a factual determination, where the Commission applies the statutory standard of 'like' or 'most similar in characteristics and uses' on a case-by-case basis."). As such, Plaintiffs' claim is largely a reiteration of their substantial evidence arguments, which are addressed in section IV.B.3. below.

To the degree a truly "legal" argument can be discerned, it is simply that the ITC failed to employ a "clear preference for broad like product definitions" in looking for "clear dividing lines among possible like products." Plaintiffs' Brief at 10 (emphasis added). While the authority cited by Plaintiffs certainly supports the idea that the ITC is to look for "clear dividing lines," nothing in this authority establishes that the Commission should seek to define the "domestic like product" broadly. Rather, this authority simply cautions that the ITC should not define the domestic industry too narrowly, since to do either might deny relief to an industry adversely affected by unfairly-traded imports.[5]

---

[5] In their initial brief, Plaintiffs argue that "[t]his broad approach is mandated by the legislative history of . . . 19 U.S.C. § 1677(10)." Plaintiffs' Brief at 10. While the legislative history cited by Plaintiffs shows Congress' intent that the domestic like product not be defined too narrowly, nothing in this history indicates that a "broad" approach is to be preferred in defining the "domestic like product." See S. Rep. No. 96-249, at 90-91, reprinted in 1979 U.S.C.C.A.N. 476-77 ("The requirement that a product be 'like' the imported article should not be interpreted in such a narrow fashion as to permit minor differences in physical characteristics or uses to lead to the conclusion that the [domestic] product and [imported] article are not 'like' each other, nor should the definition of 'like product' be interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under investigation."). Similarly, the court finds no "clear preference for broad like product definitions" expressed in any of the other authority cited by Plaintiffs. See Plaintiffs' Brief at 11 n.9 (citing Chung Ling Co. v. United States, 16 CIT 636, 647, 805 F. Supp. 45, 54 (1992); Torrington, 14 CIT at 650-52, 747 F. Supp. at 748-49; and Plate Final Determination at 4). Rather, this authority simply

Most importantly, however, Plaintiffs' do not identify any legal interpretation that is in error. In fact, Plaintiffs' Brief does just the opposite, twice citing the Plate Final Determination itself as authority for the "correct" legal approach to domestic like product determinations. See Plaintiffs' Brief at 11 nn. 9 & 11 (citing Plate Final Determination at 4, which states that "[t]he Commission looks for clear dividing lines among possible like products, and generally disregards minor variations."). Because Plaintiffs themselves recognize that the Commission applied the correct legal standard in this case, the court finds no basis in their argument for holding that the ITC failed to act in accordance with law.

In Plaintiffs' second legal argument, the court finds similar infirmities. Essentially, Plaintiffs present a two-pronged claim, arguing (1) that there is no presumption that the domestic like product should correspond to the scope of the subject merchandise identified by Commerce; and (2) that "[t]he Commission failed to meet [its] burden in this case" of justifying the distinctions it made between products. Id. at 12-14. On its face, the second prong of this argument presents no legal challenge, as it again attacks the sufficiency of the evidence presented to justify the ITC's determination. As to the first prong, which appears[6] to argue that the Commission employed an illegal presumption, the court finds

illustrates that the Commission employs a case-by-case approach to finding "clear dividing lines" between products. See, e.g., Chung Ling, 16 CIT at 647, 805 F. Supp. at 54; Torrington, 14 CIT at 650-52, 747 F. Supp. at 748-49.

[6] The court says "appears" because Plaintiffs do not specifically allege that the ITC employed such a presumption, but rather only imply such action. See Plaintiffs' Brief at 12 ("[T]he Commission has the independent legal responsibility to determine what domestic product is like the imported articles Commerce has identified, and is not bound by the parameters of the scope of the investigation. If the Commission were bound by the parameters of the scope of the investigation, it would be abdicating its responsibility for administering the law to the petitioners. Clearly this would be inappropriate, particularly in a case where petitioners have filed two separate actions on stainless steel flat-rolled products within weeks apart.") (footnote omitted).

no merit.  Not only is there no evidence in the <u>Plate Final Determination</u> that the ITC employed such a presumption, but the limited discussion and citations on point clearly show that the ITC was aware of, and acted in accordance with, its authority to make an <u>independent</u> like product determination.  <u>See</u> <u>Plate Final Determination</u> at 4 ("Although the Commission must accept the determination of Commerce as to the scope of the imported merchandise . . . the Commission determines what domestic product is like the imported articles Commerce has identified.") and 4 n.8 (citing, <u>inter alia</u>, <u>Hosiden Corp.</u>, 85 F.3d 1561, for the proposition that the ITC may find one or more like products that corresponds to class or classes of merchandise identified by Commerce).  Plaintiffs provide no basis for finding otherwise.

In short, the court rejects Plaintiffs' claims that the Commission committed legal error.  The legal standards set out in the <u>Plate Final Determination</u> are simply those that have been  repeatedly affirmed as proper for domestic like product determinations,[7] and Plaintiffs provide no reason to question this observation or the validity of those standards.  Accordingly, the court turns to the second part of Plaintiffs' case, their factual arguments.

---

[7] <u>Compare</u> <u>Plate Final Determination</u> at 4 ("The Commission looks for clear dividing lines among possible like products, and generally disregards minor variations.") <u>with</u> <u>NEC Corp.</u>, 36 F. Supp.2d at 383 ("The ITC has generally sought 'clear dividing lines' between product groups.") <u>and</u> <u>Aramide Maatschappij V.O.F. v. United States</u>, 19 CIT 884, 885 (1995) ("[T]he Commission seeks clear dividing lines among possible like products and generally disregards minor variations.").

**B**

## THE COMMISSION'S "DOMESTIC LIKE PRODUCT" DETERMINATION IS SUPPORTED BY SUBSTANTIAL RECORD EVIDENCE.

**1**

### Those Portions of the Sheet and Strip Preliminary Determination Considered By the Commission Are Part of the Record of this Investigation.

As noted above, Plaintiffs present various arguments why substantial record evidence does not support the ITC's like product determination, one of which is that the Commission improperly relied on facts developed in the Sheet and Strip Preliminary Determination. Because like product determinations are based on the unique facts of each investigation, Plaintiffs claim that the ITC erred in relying upon its previous decision in Sheet and Strip Preliminary Determination as a basis for its determination in Plate Final Determination. See Plaintiffs' Brief at 21-24. In fact, Plaintiffs argue, not only was it error to rely on this previous investigation, but evidence from the Sheet and Strip Preliminary Determination is not even part of the record of this investigation that the court may now review. See id. at 24; Plaintiffs' Rebuttal Brief at 8-10.

Plaintiffs' argument posits two separate, though related, questions: whether the ITC improperly relied on another investigation, and whether certain parts of another investigation are properly part of the "record" of this investigation. Regarding the former inquiry, the court finds no error in the ITC's reliance on its findings in Sheet and Strip Preliminary Determination as a basis for its findings in Plate Final Determination. As Plaintiffs correctly note, because of the factual nature of such investigations, a domestic like product finding in one investigation is not dispositive of another like product investigation. See, e.g., Nippon Steel Corp. v. United States, 19 CIT 450, 454-55 (1995) ("Selection of the bases

upon which a like product determination is made is within the Commission's discretion, and may

depend upon the unique facts of each case."). Simply because a previous investigation is not

dispositive, however, does not mean it is irrelevant. Where, as here, the ITC has addressed similar or

identical facts, no statute or case authority prohibits it from drawing upon its previous work in

addressing the issue at hand. See Royal Thai Gov't v. United States, 17 CIT 534, 538, 824 F. Supp.

1089, 1093 (1993) ("The relevant Steel Wire Rope evidence is not barred from the record merely

because it was obtained in a separate investigation."); accord Intrepid v. Int'l Trade Admin., 16 CIT

204, 787 F. Supp. 227, 229 (1992) (finding that Commerce may rely on evidence from a related,

though separate, investigation). In fact, to find otherwise would require the ITC to ignore its institutional

experience and make each like product determination in a vacuum -- an impractical conclusion which

cannot be reasonably endorsed. See United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515,

528 (1946) (rejecting and characterizing a similar claim as "a legal version of the scriptural injunction

against letting one's right hand know what one's left hand may be doing").

Turning to the second query raised by Plaintiffs' arguments, whether the ITC improperly relied

on non-record evidence, the court notes that 19 U.S.C. § 1516a(b)(2)(A) (1994) provides that the

record consists of "all information presented to or obtained by the . . . Commission during the course of

the administrative proceeding, including all governmental memoranda pertaining to the case and the

record of ex parte meetings required to be kept by section 1677f(a)(3) of this title."[8] In light of this

broad definition, this court has recognized that, although "documents obtained for other investigations

---

[8] See also Beker Indus. Corp. v. United States, 7 CIT 313, 315 (1984) ("The scope of the record for purposes of judicial review is based upon information which was 'before the relevant decision-maker' and was presented and considered 'at the time the decision was rendered.'") (quoting S. Rep. No. 96-249 at 247-48 (1979), reprinted in 1979 U.S.C.C.A.N. 633).

do not automatically become part of the record of related investigations," "those documents at the agency which become sufficiently intertwined with the relevant inquiry are part of the record, no matter how or when they arrived at the agency." Floral Trade Council of Davis, Cal. v. United States, 13 CIT 242, 243, 709 F. Supp. 229, 230 (1989); see also IPSCO, Inc. v. United States, 12 CIT 1128, 1130, 701 F. Supp. 236, 238 (1988), aff'd in part and rev'd on other grounds, 899 F.2d 1192 (Fed. Cir. 1990) ("If ITA wishes to apply information gleaned from public documents it may do so, so long as it relates such information to the facts of the case before it."); Intrepid, 16 CIT at 205, 787 F. Supp. at 228 (finding documents from an antidumping scope investigation to be part of the record of a separate countervailing duty investigation). Thus, the question before the court is whether certain documents from the "sheet and strip" investigation became so intertwined with the relevant inquiry here as to be considered "presented to or obtained by the . . . Commission during the course of the [stainless steel plate] proceeding." 19 U.S.C. §1516a(b)(2)(A) (1994).

In its certified list of record evidence in this investigation, the ITC identified four "sheet and strip" documents as having been "incorporated by reference": (1) various pages from a hearing transcript dated 07/01/98 (List 1, Doc. 261); (2) two pages from petitioners' post-conference brief (List 1, Doc. 262); (3) various pages of the post-conference brief filed by respondents Acciai Speciali Terni S.p.A. and Acciai Speciali Terni USA, Inc. (List 1, Doc. 263); and (4) the Sheet and Strip Preliminary Determination itself (List 1, Doc. 264). See Letter from Donna R. Koehnke to Raymond F. Burghardt, Clerk of the Court, of 08/26/99. Plaintiffs allege that this certification "does not establish that these documents are properly part of the record of this case," as "[n]owhere in the Commission's determination, in the Prehearing or Posthearing Staff Report, or elsewhere in this record is there any indication that the factual record in *Sheet and Strip* was incorporated in the record of this proceeding."

Plaintiffs' Rebuttal Brief at 9.  However, even if these documents are part of the record, Plaintiffs add, the ITC's certification precludes it "from asserting that any other information is a part of the record of this case."  Id.  According to Plaintiffs, the proprietary documents not falling within this certification "contain the core factual basis for the Commission's preliminary determination in the *Sheet and Strip* case."  Id. at 10.

The court rejects Plaintiffs' claim.  Not only did the Commission explicitly adopt the reasoning of the Sheet and Strip Preliminary Determination in the Plate Final Determination, but the language and citations it used in these investigations shows that it considered significant portions of both records in arriving at its conclusions in both investigations.[9]  Moreover, Plaintiffs' arguments ask this court to ignore the significant correspondence in timing, parties, and issues between the two investigations, as well as the fact that Plaintiffs themselves treated evidence from the two investigations as interrelated in their submissions to the agency.  See Post-Conference Brief of Acciai Speciali Terni SpA and Acciai Speciali Terni U.S.A., Inc. ("Acciai") (List 1, Doc. 263) at 9 & n.9 (citing, in regard to the Sheet and Strip Prelim. Determ., testimony from the Plate Prelim. Determ.); Post-Conference Brief of [Acciai] (List 2, Doc. 15) at 14 (suggesting that "the ITC could incorporate the responses received in the current *Stainless Steel Sheet and Strip* proceeding into this investigation" and noting that "the responses of the domestic interested parties in the *Sheet and Strip* case would certainly be relevant

---

[9] See, e.g. Plate Final Determination at 5 ("There is no new information in the record of these investigations that leads us to question the Commission's reasoning in the [Sheet and Strip Prelim.]") (emphasis added) and n.13 (summarizing Sheet and Strip Prelim. findings); Sheet and Strip Prelim. at 9 n.46 (comparing Table III-1 of the Sheet and Strip Prelim. with part of the Plate Prelim. Determ.), 9 n.51 ("Additional information in the record of the instant investigations further supports the Commission's preliminary conclusion in Plate . . . and vice versa in these preliminary investigation phases."), 7 n.25, 8 nn.37 & 40, and 9 n.47 (citing Plate Prelim. Determ.); ITC Staff Report for Plate Final Determ., dated 04/09/99 (List 2, Doc. 28), at I-10 (discussing and citing Sheet and Strip Prelim. Determ.).

with respect to the 'like product' issue.").  That, the court will not do.

Accordingly, the court is satisfied that the four documents from the "sheet and strip" investigation certified by the ITC as part of the record in this case were "presented to or obtained by the . . . Commission during the course of the [stainless steel plate] proceeding."  19 U.S.C. § 1516a(b)(2)(A) (1994).  The treatment of these concurrent investigations by both the ITC and the parties, as well as the circumstances surrounding the case, leave little doubt that significant portions of both records were concurrently considered by the Commission in reaching its respective decisions. The court therefore rejects Plaintiffs' contention concerning the scope of the record, and examines the four certified documents from the "sheet and strip" investigation, as well as the evidence specific to this investigation, in addressing Plaintiffs' remaining claims.

## 2

### The ITC's Failure to Accept a Party's Proposed Questions, or Seek Information from Any Particular Source, Does Not Leave its Determination Unsupported by Substantial Record Evidence.

Plaintiffs next attack the ITC's like product determination by arguing that it abused its discretion in failing to request essential data.  According to Plaintiffs, the ITC's conclusion that "[t]here is no new information . . . that leads us to question the Commission's reasoning in the [Sheet & Strip Preliminary Determination]"[10] is an "outrageous statement," since "the absence of new information . . . was solely due to the Commission's failure to meet its obligation to obtain such information . . . ."  Plaintiffs' Brief at 29-30.  Specifically, Plaintiffs allege that, despite their requests, U.S. purchasers of stainless steel plate were never provided an opportunity "to address the 'domestic like product' issue in the questionnaires

_____

[10] Plate Final Determination at 5.

issued in the final phase of this investigation." Id. at 20. According to Plaintiffs, such purchasers "are uniquely qualified to address many of the factors involved in the Commission's 'domestic like product' determination, such as customer perceptions, channels of distribution and interchangeability of end-uses." Id. Thus, they claim, the ITC's "failure to fulfill this obligation and to obtain the information necessary to a reasoned determination constitutes reversible error." Id. at 21.[11]

By presenting the foregoing arguments separate from, and in addition to, their "substantial evidence" argument, Plaintiffs appear to seek a judicial inquiry into the adequacy or thoroughness of the ITC's investigation. To the degree this is correct, Plaintiffs' arguments place the cart before the horse. While the ITC must collect information sufficient to render a reasoned like product determination, the court does not begin its review by analyzing the specific questions posed by the Commission. Nothing in the relevant statutes governing like product determinations mandates that the ITC accept a party's proposed questions, or seek information from any particular source. Rather, the question of whether the ITC conduced a thorough like-product investigation begins with the substantial evidence test, and the question of whether, in light of the record evidence as a whole, "it would have been possible for a reasonable jury to reach the [Commission's] conclusion." Allentown Mack Sales and Service, Inc. v.

_____

[11] At oral argument, Plaintiffs' counsel agreed that there is little distinction between the arguments raised in sections II.B. and III of Plaintiffs' Brief. Essentially, both sections argue that the ITC abused its discretion by not seeking adequate information for its like product determination. Compare Plaintiffs' Brief at 21 ("The Commission's failure to fulfill this obligation and obtain the information necessary to a reasoned determination constitutes reversible error.") with Plaintiffs' Brief at 28 ("There can be no question that the ITC's failure to collect pertinent data relating to the specific domestic like product issue constituted an abuse of discretion."). The discernable difference appears to be that, while the argument advanced in section III attack the sufficiency of the ITC's investigation generally, those advanced in section II.B. concern only the Commission's alleged failure to acquire data from domestic purchasers. Since this distinction does not affect the analysis of these arguments, the court address them concurrently.

National Labor Relations Board, 522 U.S. 359, 366 (1998).  While failure to meet this test will often

indicate that the ITC's investigation was lacking in some respect, the ITC's failure to seek particular

information does not necessarily lead to a conclusion that the agency's final determination was

unsupported by substantial evidence.  As the Federal Circuit noted in regard to a similar claim,

> [w]hile it may be true that the ITC staff might have been more aggressive in pursuing
> plant-by-plant data . . . , we are not here reviewing the ITC's diligence. . . .  Rather,
> Atlantic Sugar's concerns go to the question of the evidence on the record for the injury
> determination, as discussed below.  If that evidence is insubstantial, then the reviewing
> court must either reverse the ITC's determination or remand the case for further fact-
> finding.

Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1561 (1984); accord Kenda Rubber Indus. Co.,

Ltd. v. United States, 10 CIT 120, 124-26, 630 F. Supp. 354, 357-58 (1986); see also Hercules, Inc.

v. United States, 11 CIT 710, 743, 673 F. Supp. 454, 482 (1987) ("There appears to be no

recognized or statutorily set minimum standard by which the thoroughness of the investigation is

measured."); Timken Co. v. United States, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988), aff'd 894

F.2d 385 (Fed. Cir. 1990) ("[T]o the extent the administering agency's diligence is relevant, it relates

only to the issue of determining the question of the substantiality of the evidence.").

Accordingly, because Congress has provided the ITC with broad authority for making its like-

product determination, the court rejects Plaintiffs' claims to the extent they seek a determination of

whether the ITC should have asked more, or different, questions.  Instead, the court treats Plaintiffs'

claims as another iteration of its general argument that substantial record evidence does not support the

ITC's like product determination.[12]  It is to this final claim that the court now turns.


**3**

**The Plate Final Determination is Supported by Substantial Record Evidence.**


The last question the court needs to resolve is whether substantial record evidence supports the

ITC's decision to distinguish stainless steel plate from stainless steel sheet and strip.  In the Plate Final

Determination, the Commission stated that


> In the preliminary phase of these investigations, the Commission found a single domestic like product, "certain stainless steel plate in coils," corresponding with Commerce's description of the subject merchandise.  It indicated, however, that it would reconsider . . . in the final phase:  whether to include stainless steel sheet and strip in the domestic like products. . . .
>
> The Commission subsequently discussed the first of those issues in detail in [Sheet and Strip Prelim.].  In that case, after performing a detailed comparison of stainless steel plate in coils and stainless steel sheet and strip applying the traditional like product factors, the Commission reaffirmed its preliminary determination from the instant investigations that stainless steel plate in coils and stainless steel sheet and strip are not the same domestic like product.  There is no new information in the record of

---

[12] To support their position that the ITC's investigation constituted an abuse of discretion, Plaintiffs quote Mitsubishi Elec. Corp. v. United States, 12 CIT 1025, 700 F. Supp. 538 (1988), for the proposition that "'where the Commission actively precludes itself from receiving relevant data or takes no effort to seek relevant data . . . then such actions will be found to be contrary to law.'"  See Plaintiffs' Brief at 26 (quoting Mitsubishi, 12 CIT at 1057, 700 F. Supp. at 564).  In Mitsubishi, the ITC used "product line" data pursuant to 19 U.S.C. § 1677(4)(D) in conducting its injury analysis, after affirmatively stating that it was not seeking product specific data.  The court found that the ITC had violated  § 1677(4)(D), since the statute specifically "directs the ITC [to] assess domestic production where available data exists. . . ."  Mitsubishi, 12 CIT at 1058, 700 F. Supp. at 564.  Here, there is no indication that the ITC affirmatively refused to consider a type of evidence which, legally, it was obliged to consider.  At most, Plaintiffs allege that the ITC was not thorough enough in its investigation -- a claim substantively different from the issue in Mitsubishi.

these investigations that leads us to question the Commission's reasoning in the [Sheet and Strip Prelim.]. Accordingly, for the reasons set forth in the [Sheet and Strip Prelim.], we determine that the domestic like product in these investigations does not include stainless steel sheet and strip.

Plate Final Determination at 4-5 (footnotes omitted). In addition to this explanation, the ITC also

stated in a footnote that:

> The Commission concluded [in Sheet and Strip Prelim.] that although the products shared similar chemical compositions and properties, distinctions in thickness between the two products corresponded to different end-uses and channels of distribution, and resulted in limited interchangeability. The Commission also observed that virtually all (97 percent of) sheet and strip, but a very small proportion of HRAP plate, undergoes the more extensive additional processing of cold-rolling. [Sheet and Strip Prelim.] at 9-10; *see also* Stainless Steel Sheet and Strip from the Federal Republic of Germany and France and Stainless Steel Sheet and Strip and Plate from the United Kingdom, Inv. Nos. 731-TA-92 and 95, and Inv. Nos. 701-TA-195 and 196, USITC Pub. 1391 (June 1983).

Id. at 5 n.13.

These explanations make clear that the ITC relied on its findings from the Sheet and Strip

Preliminary Determination -- particularly its findings concerning the different end uses, different channels

of distribution, limited interchangeability and further processing -- in reaching its decision here.[13] In

_____

[13] As noted previously, in the Sheet and Strip Prelim., the ITC concluded that

> Although all flat stainless products share similar chemical compositions and properties, the industry has established a specific thickness-based distinction between plate on the one hand, and sheet and strip, on the other. To a large degree, these distinctions correspond to different end uses and channels of distribution, and result in limited interchangeability. While sheet and plate generally are produced by similar, and sometimes, common initial manufacturing processes and equipment, virtually all sheet and strip undergoes the more extensive additional processing of cold-rolling before

support of its findings in the <u>Sheet and Strip Preliminary Determination</u>, the ITC cited the following

evidence which, in accordance with Section IV.B.1. above, is part of the record of the <u>Plate Final</u>

<u>Determination</u>:

> **!** As evidence that "differences in thickness appears to dictate different end uses," <u>Sheet and Strip Prelim.</u> at 6, testimony from Robert W. Rutherford, Senior Vice President, Commercial, Allegheny Ludlum Corp., that "[p]late basically is sold into the capital goods sector for large tanks and fabricated parts," whereas "about two-thirds of the sales [of cold-rolled sheet and strip"] go into consumer durables such as pots and pans, sinks, flatware." Conf. Tr. of 07/01/98 (List 1, Doc. 261) at 85-86 (cited in <u>Sheet and Strip Prelim.</u> at 7 nn. 25 & 27).

> **!** As evidence that "[t]he interchangeability between [stainless steel sheet and strip] and plate is limited by the inherent differences in their thickness and appearance," <u>Sheet and Strip Prelim.</u> at 7, (1) testimony by Dr. Patrick J. Magrath, Chief Economist and Managing Director, Georgetown Economic Services, LLC, that "no reputable construction firm would try to cheat and have a thinner gauge material . . . if he has to build a tank that the chemical engineer has said you've got to have stainless steel in coiled plate gauges;" (2) testimony by Dr. Magrath that "there's a clear dividing line between plate and sheet" since "[i]t would be just too prohibitively expensive in most instances to ['try to do the same applications [with a thick plate product] with the same surface area where a sheet application would be called for.'];" (3) testimony by Paul Rosenthal, Esq., counsel for the domestic industry, that "I would say that anyone who bought a plate product when they really needed sheet and strip or vice versa as a customer is going to be looking for a new purchasing job;" and (4) the above noted testimony of Robert Rutherford that "[p]late basically is sold into the capital goods sector for large tanks and fabricated parts," whereas "about two-thirds of the sales [of cold-rolled sheet and strip] go into consumer durables such as pots and pans, sinks, flatware." Conf. Tr. of 07/01/98 (List 1, Doc. 261) at 79-83, 85-86 (cited in <u>Sheet</u>

---

being sold for end use. The cold-rolling process used to finish sheet and strip entails the use of different employees and equipment from that used for hot-rolling, and is usually performed in different facilities, and in some instances, by different producers. The additional processing adds substantial value to the sheet and strip and results in different pricing practices from those used for plate. For these reasons, we do not include plate in our definition of the domestic like product.

<u>Sheet and Strip Prelim.</u> at 9. (footnotes omitted).

and Strip Prelim. at 7 nn. 28 & 29).

! As evidence that "[i]ndustry standards explicitly distinguish between plate and sheet and strip," Sheet and Strip Prelim. at 7, various industry standards which distinguish the products based on a thickness of approximately 4.75 mm. Id. at 7 n.33 (citing, inter alia, Table I-2 and stating that "ASTM, ASM and AISI all distinguish [sheet and strip] from stainless plate."). Table I-2 to the Sheet and Strip Preliminary Determination notes that "plate" is defined by the American Iron and Steel Institute ("AISI") as "[f]lat-rolled products . . . 0.1875 in. or more in thickness rolled on conventional sheet/strip mills," by the American Society for Testing and Materials ("ASTM") as "[m]aterial 0.1875 in (5.00 mm) and over in thickness," and by ASM International as "[f]lat-rolled or forget product . . . at least 4.76 mm.(0.1875 in.) in thickness." The Commission also noted that while "[t]he AISI distinguishes between plate and sheet for stainless products," the AISI does not draw such a distinction for carbon steel products. Id. (citing Petitioners' Postconference Brief (List 1, Doc. 262) at 17 n.20[14]). See also Plate Prelim. Determ. at 12 & n.66 (similarly discussing ASTM and AISI definitions).

! As evidence that "U.S. producers . . . view sheet and strip as distinct from plate, in light of the additional processing entailed in finishing [stainless steel sheet and strip] and differences in end uses," Sheet and Strip Prelim. at 7, (1) testimony by Charles A. Stitt, General Manager, Marketing, Armco, Inc., that there are "significant differences" between the products since, inter alia, "the vast majority of [hot-rolled] sheet and strip is dedicated to further processing by cold-rolling, whereas coiled plate is rarely further processed by cold-rolling"[15]; (2) testimony by Charles Stitt that "most coiled plate is sold to service centers, which buy little or no [hot-rolled] sheet and strip. While cold-

---

[14] Petitioners' Postconference Brief (List 1, Doc. 262) at 17 n.20 states that

The existence of this industry standard differentiating stainless steel plate from [stainless steel sheet and strip] is an important distinguishing fact between this case and the carbon steel cases, because no such distinction exists in the carbon steel industry. In the 1993 Carbon Steel cases, the Commission focused on the absence of any standard differentiating plate from sheet in carbon steel: "Petitioners noted that the American Iron and Steel Institute ("AISI") views coiled plate products in plate gauges as coiled sheet, rather than plate." [AISI Product Definitions for Stainless Steel Shipment Reporting] at 13, n.20.

[15] Charles Stitt also testified that only "[a] very small amount of [sheet and strip] is sold as hot-rolled sheet and strip," while 97 percent of hot-rolled sheet and strip is subject to further cold-rolling. Conf. Tr. of 07/01/98 (List 1, Doc. 261) at 79 (cited in Sheet and Strip Prelim. at 7 n.34).

rolled sheet and strip is also sold to service centers . . . , significant amounts are sold to end-users."; (3) testimony by David Hartquist, Esq., counsel for the domestic industry, that producers know early in the production process whether stainless steel will be made into plate or sheet or strip, since "the whole direction of the production process varies considerably by what the order is for . . . .;" and (4) the above noted testimony by Dr. Patrick Magrath and Robert Rutherford concerning the different end-uses for these products. Conf. Tr. of 07/01/98 (List 1, Doc. 261) at 29-30, 79-81, 86 (cited in Sheet and Strip Prelim. at 7 n.34).

!  As evidence that "[p]roducers' sales staffs and their customers perceive significant differences between plate and sheet and strip," Sheet and Strip Prelim. at 7, (1) testimony by Paul Rosenthal that "[s]imply stated, I don't think customers or end users use these products at all as interchangeable;" (2) testimony by Charles Stitt that while most sheet and strip is sold in large quantities directly to original equipment manufacturers, most plate is sold in large quantities to distributors who, in turn, sell the plate in small quantities; and (3) testimony by Robert Rutherford that "by and large" Allegheny Ludlum produces cold rolled sheet and strip for specific end uses, whereas stainless steel that "would go through a service center or a distributor" is made as a fungible-type product." Conf. Tr. of 07/01/98 (List 1, Doc. 261) at 83, 85-87 (cited in Sheet and Strip Prelim. at 7 n.35).

!  As evidence that "[o]n a per-pound basis, finished (*i.e.* cold-rolled) sheet and strip generally costs more than finished (*i.e.* HRAP) plate, because the sheet and strip has more value added to it," Sheet and Strip Prelim. at 9, testimony from Daniel W. Lebherz, Marketing Manager-Industrial, Armco, Inc. Id. at 7 n.48 (citing, inter alia, Conf. Tr. of 07/01/98 (List 1, Doc. 261) at 84.

!  As evidence that "[b]ecause of . . . differences in pricing practices, stainless steel producers price sheet and strip based on different schedules from those used for plate," testimony from Daniel Lebherz. Sheet and Strip Prelim. at 9 n.50 (citing, inter alia, Conf. Tr. of 07/01/98 (List 1, Doc. 261) at 84-85).[16]

---

[16] Daniel Lebherz testified in full that

On a per-pound basis, generally the sheet would cost more than the hot-rolled plate because the sheet has had more value added put into it. But, as Paul [Rosenthal] just described, because of the pounds per square foot would be much greater on the heavier material, at some point there is a crossover where a square foot of plate depending on the gauge is obviously going to cost more than a square foot of sheet. Perhaps in most cases, probably in all cases. I mean, we generally don't look at it like

In addition to the foregoing,[17] the <u>Sheet and Strip Preliminary Determination</u> expressly referred to, and implicitly adopted the relevant evidence from, its findings in the <u>Plate Preliminary Determination</u>. <u>See</u> <u>Sheet and Strip Prelim.</u> at 7 n.25, 8 nn. 37 & 40, 9 nn. 46, 47 & 51 (citing and discussing <u>Plate Prelim.</u> <u>Determ.</u>). These include:

!      The Commission's preliminary finding that "[m]ost stainless steel sheet and strip are further processed by cold-rolling before sale, whereas only a very small percentage of stainless steel plate is cold-rolled, and most of that has the less extensive cold-worked process of a light skin pass." <u>Plate Prelim. Determ.</u> at 12 (footnote omitted); <u>see also</u> <u>Sheet and Strip Prelim.</u> at 8 n.40 (citing this previous finding as support for its statement that "similarities in the production process for plate and sheet and strip end once the product in annealed and pickled. At that point, the great majority of stainless plate is sold as a finished product."); <u>see also</u> <u>id.</u> 8 n.41 (citing Conf. Tr. at 56 and finding that "[b]y comparison, except for the approximately two percent of HRAP sheet and strip that is sold for conversion into pipe and tube, all other HRAP sheet and strip is cold-rolled before it is considered a finished product suitable for end use applications.").

This evidence provides a sufficient basis for the Commission's determination that a clear dividing line may be drawn between stainless steel flat-rolled products 4.75 mm. or more in thickness and stainless steel flat-rolled products less than 4.75 mm. in thickness. It shows not only that virtually

---

that. They're priced off of different schedules and treated completely differently as a matter of fact.

Conf. Tr. of 07/01/98 (List 1, Doc. 261) at 84-85.

[17] Because it is not clear whether the data underlying the various charts and tables attached to the Commission's findings in the <u>Sheet and Strip Preliminary Determination</u> is part of the record of this case, the court does not consider this evidence for present purposes. The exception to this is Table I-2 summarizing the various industry standards, since this information is both publically available and clearly part of the record of the <u>Plate Final Determination</u> in its own right. The court notes, however, that these charts and tables appear to be consistent with, and provide significant additional support for, the distinction drawn by the Commission.

all sheet and strip is subject to additional processing (i.e., cold-rolling) beyond that associated with plate production, but that the respective products have significantly different (non-interchangeable) applications, are priced and sold differently, and are perceived differently in the industry. Moreover, nothing in the other record evidence requires a different result. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The most significant findings (and supporting evidence) detracting from the substantiality of the above are that (a) "the initial processing for producing plate and sheet and strip are the same"; (b) "[sheet and strip] and stainless plate are both used in the stainless pipe and tube production"; and (c) "all flat stainless products share similar chemical compositions and properties." Sheet and Strip Prelim. Determ. at 8-9; see also Plate Prelim. Determ. at 11-13. While these findings establish that plate and sheet and strip share common attributes and uses, they fail to demonstrate such commonality that a reasonable trier of fact could not have distinguished the respective products based on the evidence above. Perhaps most significantly, no evidence from these investigations clearly rebuts the Commission's conclusions concerning the different end uses, manufacturing processes, distribution, prices and perceptions concerning the respective products.[18] Rather, other evidence from the "plate" investigation is generally consistent with Commission's determination.[19]

---

[18] See infra, note 21 (discussing evidence Plaintiffs claim the ITC failed to discuss).

[19] See, e.g., Plate Prelim. Determ. at 11 & n.61 (citing similar 1983 investigation which found that while "plate was used primarily in the production of industrial equipment," "sheet and strip was used extensively in the production of consumer durable goods.") and 12 & nn. 68 & 69 (citing evidence that most sheet and strip, but only a small percentage of plate, is cold-rolled); Plate Final Hearing Transcript (List 1, Doc. 177) at 117-18 (testimony of Robert Rutherford concerning how Allegheny Ludlum treats orders for plate differently from those for sheet and strip, how the products have different customer bases, and how "[a] company that would buy plate uses it normally in the same thickness that they would purchase it.").

As noted above, throughout its briefs Plaintiffs advance various arguments why the ITC conducted an inadequate investigation for purposes of the Plate Final Determination. Although the substantiality of the evidence identified by the ITC in the "sheet and strip" and "plate" preliminary determinations (and adopted by the Commission in the Plate Final Determination) makes these arguments moot, they also fail on their merits. The record shows that the ITC requested additional information from purchasers, producers and importers subsequent to its August 1998 Sheet and Strip Preliminary Determination, including, inter alia, asking purchasers whether there "[a]re there other products that could be substituted for certain stainless steel plate in its end uses?" Out of the 27 purchasers who answered this question, none of them responded that sheet or strip was a substitute for plate. See List 2, Docs. 122, 160-62, 164, 166, 168-69, 177-93, 210, 219 at 7. Similarly, only one out of 15 importers, and no domestic producers, identified sheet or strip as a substitute for stainless steel plate in response to the same question. See List 2, Docs. 135, 137-39, 140-41, 154, 156, 197, 209, 274 at 13 and Answer "A" attachment (importer questionnaires); List 2, Docs. 276, 278, 280, 312-13 at 26 (domestic producer questionnaires). This extensive body of evidence shows that, contrary to Plaintiffs' claims, the ITC did collect probative information subsequent to its Sheet and Strip Preliminary Determination.[20] The responses also show that the ITC acted reasonably when, in view of

---

[20] In their Rebuttal Brief, Plaintiffs argue that the ITC's question as to whether there are any products that could be substituted for stainless steel plate in its end uses "[c]learly . . . did not elicit any responses as to whether stainless steel plate and . . . sheet are or are not interchangeable. The most that can be said is that the responses are ambiguous . . . ." Plaintiffs' Rebuttal Brief at 8. At oral argument, Plaintiffs' counsel elaborated on this argument by stating that the range of responses provided by domestic purchasers shows that purchasers were confused as to what information the ITC was looking for in this question, and that the question was asked to elicit "demand" information instead of "like product" information.

Although a more direct "comparison" question concerning sheet and strip might have been more probative, there is little basis for concluding that the question was "confusing" or that the responses

this additional evidence, it stated that "[t]here is no new information in the record of these investigations that leads us to question the Commission's reasoning in the [Sheet and Strip Prelim. Determ.]." Plate Final Determination at 5.

Finally, the court rejects Plaintiffs' argument that the ITC's analysis is flawed because it "failed to adequately address the contrary evidence." Plaintiffs' Brief at 18. According to Plaintiffs, "the Commission never even acknowledged testimony that clearly established that the industry itself refers to all stainless steel flat-rolled products as one single continuum under the denomination of 'continuous mill plate' or 'CMP' or 'Hot Rolled Annealed and Pickled' ('HRAP'). Nor did the Commission address AST's testimony that CMP can be used for similar applications regardless of whether it is thinner or thicker than 4.75 mm." Id. at 18-19 (footnote omitted). The ITC, however, need not explicitly discuss every piece of record evidence, and the evidence cited by Plaintiffs does not show the Commission's determination to be unsupported.[21] See Nakajima All Co. v. United States, 14 CIT 469, 478, 744 F.

_____

were "ambiguous." The questionnaire explicitly excluded "sheet and strip" from the scope of products under review, and defined "plate" in terms of the relevant Harmonized Tariff System headings and subheadings (which, in turn, generally defined the product as being over 4.75 mm. in thickness). See "General Information, Instruction, and Definitions for Commission Questionnaires" (List 1, Doc. 112) at 3-4. Given these definitions, and in light of record evidence that the industry itself recognizes a distinction between "plate" and "sheet and strip" based on a thickness of approximately 4.75 mm., see Sheet and Strip Prelim. at 7 n.33 (stating that "ASTM, ASM and AISI all distinguish [sheet and strip] from stainless plate."), the court sees no reason why purchasers would not have listed stainless steel sheet and strip as a potential substitute for plate (as one purchaser actually did), had they believed these products to be substitutable. Thus, the fact that only one importer listed "sheet and strip" as substitutable for "plate" indicates that the ITC acted reasonably in relying on its earlier findings that plate and sheet and strip are generally neither interchangeable nor subject to similar end uses.

[21] Plaintiffs' argument concerning the acronyms "CMP" and "HRAP" appears largely irrelevant. According to Defendant, the phrases "continuous milled plate" and "hot rolled annealed and pickled" are associated only with hot-rolled products, and accordingly "would not apply to any cold-rolled product, which comprises 97 percent of Sheet and Strip." Defendant's Response at 24 n.30. ("This

Supp. 1168, 1175 (1990) (holding that the ITC is "presumed . . . to have considered all pertinent

information sought to be brought to its attention"); see also Torrington Co. v. United States, 16 CIT

220, 224, 790 F. Supp. 1161, 1168 (1992) ("[T]here is no statutory requirement that the Commission

---

finish is ordinarily associated with plate because most of sheet and strip is subsequently cold-rolled."). Plaintiffs counsel said at oral argument that the phrase "hot rolled annealed and pickled" would not be associated with the vast majority of domestic sheet and strip production for this reason, but was unsure concerning the term "continuous milled plate."

Similarly, Plaintiffs' observation that "AST's stainless steel floor plate . . . is available in thicknesses that span the artificial dividing line Petitioners have attempted to erect," Plaintiffs' Brief at 19 n.31 (cited in Plaintiffs' Motion at 19 n.31), is also largely irrelevant. By Plaintiffs' own admission its floor plate is a unique product "not produced in the United States [which] does not compete with any US product." Post-Conference Brief of [Acciai] (List 2, Doc. 7) at 10 (footnotes omitted); accord Post-Conference Brief of [Acciai] (List 2, Doc. 15) at 19. Given these facts, it would not have been unreasonable for the Commission to have accorded this evidence little probative weight concerning the proper scope of the American like product.

The last piece of evidence cited by Plaintiffs is the testimony of Mike Adams of the Maurice Pincoffs Co. that "[m]any years ago . . . the industry distinguished between plate and coil of above 4.75 [mm.] in thickness from sheet and coil below 4.75 [mm.] . . . [i]n practice, this distinction has vanished today." Conf. Tr. of April 21, 1998 (List 1, Doc. 50) at 113; see also id. at 114 ("These products are moving through the same channels of distribution, and, in fact, our company handles a whole range of thicknesses, regardless of whether it is above or below 4.75 millimeter."). On its face, this testimony appears limited to only hot-rolled stainless steel products; a fact which, if true, would again render it largely non-probative, since the vast majority of sheet and strip is subject to subsequent cold-rolling. To the degree this testimony addresses both hot and cold-rolled products, however, it does not render the ITC's conclusion insubstantial. Mr. Adams general testimony that "[i]n practice, this distinction has vanished today" and that "[t]hese products are moving through the same channels of distribution" does not rebut any of the specific evidence concerning interchangeability, end uses, processing, prices and the like relied on by the ITC. Thus, at most this testimony constitutes opposing evidence which the Commission, in view of the record as a whole, could reasonably have found of limited credibility. See Goss Graphics Sys., Inc. v. United States, 33 F. Supp.2d 1082, 1099 (1998), aff'd 216 F.3d 1357 (Fed. Cir. 2000) ("The Commission has the discretion to assess the probative nature of the evidence obtained in its investigation and to determine whether to discount the evidence or rely on it."); Maine Potato Council v. United States, 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985) ("It is within the [ITC's] discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence.").

must respond to each piece of evidence presented by the parties."), <u>aff'd</u>, 991 F.2d 809 (Fed. Cir.

1993) (unpublished disposition). Accordingly, this argument also fails to undermine the Commission's

findings.

The court finds the ITC's decision to limit the domestic like product in the <u>Plate Final</u>

<u>Determination</u> to stainless steel products 4.75 mm. or more in thickness to be supported by substantial

record evidence. The relevant evidence identified by the ITC in the <u>Sheet and Strip Preliminary</u>

<u>Determination</u>, and explicitly adopted for purposes of the <u>Plate Final Determination</u>, reasonably

supports its findings that stainless steel sheet and strip generally have different (non-interchangeable)

applications, are priced and sold differently, and are perceived differently in the industry from stainless

steel plate. These subsidiary determinations, in turn, reasonably support the Commission's decision to

exclude sheet and strip from the scope of its investigation, notwithstanding record evidence that the

products have similar chemical compositions and properties, share initial processing, and are used in

stainless pipe and tube production.

**V**

**CONCLUSION**

For the foregoing reasons, the ITC's decision to exclude stainless steel flat-rolled products of less than 4.75 mm. in thickness from its domestic like product determination is supported by substantial record evidence and otherwise in accordance with law. The court therefore denies Plaintiffs' Motion For Judgment Upon The Agency Record Under USCIT R. 56.2, and affirms the relevant aspects of the Plate Final Determination. Judgment to this effect shall be entered accordingly.

_____
Evan J. Wallach, Judge


Dated:        October 2, 2000
              New York, New York

# ERRATA

Accia Speciali Terni S.p.A. v. United States of America, Court No. 99-06-00363, Slip Op. 00-125, dated October 2, 2000

- On p. 2-29, delete the "CONFIDENTIAL" notation at the top of each page.

October 26, 2000